## THE VIRGINIA.

### Petition of HINES, Director General of Railroads, et al.

(District Court, D. Maryland. April 2, 1920.)

1. **Shipping** ☞3½, New, vol. 8A Key-No. Series—**Director General of Railroads entitled to limitation of liability as charterer.**
   The Director General of Railroads, with respect to ships taken over and operated as a part of the property of a railroad company, *held* in effect a charterer, and entitled to limitation of liability, under Rev. St. §§ 4282, 4283 (Comp. St. §§ 8020, 8021), to the same extent as a private charterer.

2. **Shipping** ☞203—**Liability for death or injury of passengers not subject to limitation.**
   The operation of Rev. St. § 4493 (Comp. St. § 8269), which makes the owner of a vessel liable for loss of life or property of a passenger through any neglect or failure to comply with statutory requirements, or through known defects or imperfections of steaming apparatus or hull, is not restricted by anything in section 4283 (section 8021) limiting liability.

3. **Shipping** ☞208—**Mere negligence does not necessarily establish "privity and knowledge."**
   Mere negligence, pure and simple, in and of itself does not necessarily establish the existence on the part of the owner of a vessel of "privity and knowledge," within the meaning of Rev. St. § 4283 (Comp. St. § 8021); but there may be negligence which will.

4. **Shipping** ☞207—**Owner entitled to limit liability as to fire loss of cargo, but not as to passengers.**
   Owner of a steamship, which burned, causing loss of cargo, loss of life, injuries to passengers, and loss of their property, which was contributed to by neglect of the owner and its representatives to keep the fire-fighting equipment and boats of the vessel in effective condition and to maintain

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the fire drills, all of which were required by statute or regulation, and also by default of the officers and crew in failing to use the means available and to efficiently handle the boats, *held* entitled to limit its liability as to cargo loss, but not as to death and injuries and loss of property of passengers.

In Admiralty. Petition of Walker D. Hines, Director General of Railroads, and the Baltimore Steam Packet Company, for limitation of liability on account of loss of the steamer Virginia, her cargo, etc. Petition granted in part.

George Weems Williams, of Baltimore, Md., for Baltimore Steam Packet Co.

George Forbes, James U. Dennis, John Henry Skeen, Wm. D. Roycroft, Eli Frank, Frank, Emory & Beeuwkes, and George T. Mister, all of Baltimore, Md., for claimants.

ROSE, District Judge. In 1905, the steamship "Virginia" was built at Wilmington, Del., for the Baltimore Steam Packet Company, at a cost of nearly $320,000. Improvements were afterwards made to her, so that in the spring of 1919 she stood on her owner's books at $370,000. Her market value was then much greater. Many years before the packet company became a part of the Seaboard Air Line Railroad. When the government took over the latter, its vessels went along with the rest of its property, and were operated by the federal Director General of Railroads.

At about 6:30 p. m. on the 23d of May, 1919, the Virginia, with passengers and freight, left Baltimore on one of her regular trips to Norfolk. Her engines were stopped when she was about 2 miles north of Smith's Point, to facilitate the flight of her passengers from a fire which had broken out on board. Most of them were saved. A few were not, and some of the survivors suffered more or less serious injuries. The clothes they had on, whatever they carried in their hands, and some of the lifeboats, were the only other burnable things to escape destruction.

Other vessels, then in her vicinity, could not stand by until towing became practicable. Some time after they had left, a fishing steamer, the Chesapeake, belonging to the Seaboard Oil & Guano Company, on its way from Baltimore to Mila, a landing near the mouth of the Wicomico river, and some 3 miles south of Smith's Point, passed the still burning ship. The master of the Chesapeake, on his arrival at his destination, sought and obtained its owner's permission to tow the Virginia in. He got back to her about noon. He says that she had drifted some 4 miles to the eastward of her former position. He thinks, if she had been left alone, she would have shortly gone ashore on Smith's Island. She probably would not have been much hurt if she had, but it would have cost something to have gotten her off again. She was still too hot for any one to go aboard, so a line was made fast to an anchor hanging over her starboard bow. That was easy to do, but there was a chance that those who tried it might be hurt by something dropping from the wreck. By 7 in the evening,

the Virginia was at Mila. Shortly thereafter, a wrecking tug, sent by her owners from Norfolk, arrived. Night and rain had set in. The wreck was within the river's mouth, and the master of the tug concluded to leave her for that occasion where she was. Two days later he came back for her and towed her to Baltimore.

In these proceedings, what is left of her has been appraised at $23,000. The master, owner, and crew of the Chesapeake. claim salvage. They are entitled to a moderate award. Six hundred dollars seems ample. Her owner should get three-fourths of it. The remaining quarter should be distributed among her master and crew, in proportion to their wages.

[1] The Director General of Railroads, as well as the packet company, seek the protection of R. S. §§ 4282, 4283 (Comp. St. §§ 8020, 8021). The claimants contend that he has no right to it. They say that he was neither the owner nor the charterer, and is therefore not within the letter of the statutes, and that he is outside their spirit, as the Congressional purpose to encourage American investment in ships could not be furthered by limiting his liability.

The Director General would seem to be in every substantial sense a charterer, albeit one who fixed his own terms of hire. The government paid for the use of the ships, and promised to return them when its need of them had passed. The language of more than one of the war-time acts confirms the common understanding that Congress wished to change as little as was possible the former relations between the railroads and the ships, on one side, and those portions of the public which came into contact with them, on the other. It would seem that he may avail himself of the Limited Liability Acts to the same extent as a private charterer, and no further.

It is admitted that section 4282 (Comp. St. § 8020) has no application to claims for deaths, personal injuries, or the destruction of passengers' baggage. The Marine City (D. C.) 6 Fed. 413. It is argued that, notwithstanding sections 4283, 4493 (sections 8021, 8269), require their payment in full, because it is said they had their origin in the negligent failure of the petitioners to comply with the provisions of the steamboat inspection laws, and the regulations made thereunder. All the claimants unite in the contention that their right of recovery is not limited by 4283, as in their view what happened was the natural result of causes of which the petitioners had privity or knowledge. The questions to be passed upon are therefore:

(1) Did the default of the officers and crew cause or contribute to the injury to the passengers, or the loss of their baggage? If so, the petitioners are in any event answerable to an amount equal to the value of the wreck.

(2) Was the fire or the failure to extinguish it before harm was done, the result of the negligence of the petitioners? If it was, the cargo owners may share in the distribution of the amount the petitioners can be required to pay.

(3) Were the inspection laws and regulations obeyed, and, if they were not, did such disobedience have its part in causing the hurt to the passengers or their baggage? If it did, was such disobedience the

result of the negligence of the petitioners; and, if it was, are they entitled to limit their liability under section 4283?

(4) Was the disaster the proximate result of something of which the petitioners had privity or knowledge?

At the time of the fire the ship was in Maryland waters, and the rights of the death claimants depend upon its law. The fire, which broke out on this large and costly steamer, with its freight of human lives and valuable merchandise, did its work without let or hindrance. Statutory enactments and official regulations required that the ship should be equipped with an elaborate and expensive fire-fighting apparatus, and that the crew should be kept well drilled in their use. The machinery and its appliances were all there. They were in good order, if we are to believe the testimony for the petitioners, uncontradicted as it is by anything except their utter failure on the one occasion in which there was any need for them. Weekly fire drills had been duly, if perchance perfunctorily, held; yet, when the fire came, everything and everybody would have been every whit as well off if there had been no pumps, fire lines, or hose on board, and if the crew had never seen or heard of them before. She had lifeboats and liferafts sufficient to have carried safely every soul on board. After the fire was discovered, there was far more than ample time to have lowered and launched all of them, with the possible exception of two or three. There were men enough in the crew to have manned most of them. Only half of them in fact got away from the ship, and one of these subsequently capsized—in truth, because there was on her no one of the ship's company who, either by official position or personal force of character, was capable of maintaining order on board.

Although wind and sea were both in their most amiable mood, there would, in all probability, have been an appalling loss of life, had not the fire broken out at the very hour at which the upbound vessels from Norfolk met those coming down from Baltimore. From the time the Virginia left her Baltimore wharf until midnight, or thereabouts, no one noticed anything which has any significance to the inquiry now on hand. A good deal of testimony was taken as to the doings of a couple of colored women of loose character, and of the men of divers complexions who visted their amidship stateroom on the starboard side of the main saloon deck. All of this may be ignored. The witness who thought the fire might have originated in that room was almost certainly mistaken, and, if he was, the degree of disorder which had previously existed in or about it, and the vigilance, or the reverse, of the ship's officers in dealing with it, have no bearing upon anything which need be here passed upon.

Signs of fire were first seen on the freight deck, and there is reason to believe that it there originated. After smoke and perhaps flame had made passage from one end of it to the other impossible, it was still easy to move freely about the hold below and the saloon above. The trouble apparently began near the amidship freight gangway, close to the starboard side or skin of the ship. Passengers from starboard stateroom windows above, the first assistant engineer, with

his head out of the after gangway on the starboard side, and persons on other vessels testify to seeing flames before they were visible to those who were on the freight deck itself.

The testimony of the officers and crew of the ship leaves an abiding impression that there had been little watchfulness for possible outbreaks of fire. It is not easy to understand how the deck watchman could have been so long in learning that something was wrong. The record establishes that the fire was discovered by the Virginia's people, or at all events should have been, earlier than they are willing to admit. The time they give is shown to be too late, by the evidence of passengers, who looked at their watches, and by the statements of the quartermasters of the City of Norfolk and of the City of Annapolis respectively, the former of whom, on the northward, saw flames at 12:20, and the latter of whom made them out only a few minutes later from a point at least 8 miles to the southward. The wish, conscious or subconscious, to escape the implications which a prompter discovery of the fire might raise, is explanation enough of the eagerness of the Virginia's company to persuade themselves and others that there was little time between their first knowledge that anything was wrong and the final abandonment of the ship.

We do not know what caused the fire. If the carelessness of anybody had any share in it, he has kept the fact to himself. As the story is told by the witnesses for the petitioners, the first assistant engineer was the first of the ship's company to notice anything wrong. It was his watch. He tells us that he had stepped out of the engine room to the after freight gangway to look for Smith's Point Light. As he turned to go back to his station, he saw a puff of smoke coming out of the starboard side of the vessel. He took another look, and made out smoke, and, as he thought, a little flame, issuing from the amidship gangway. He went forward to investigate, but was stopped by the smoke. He ran into the engine room, and through the speaking tube told the first officer in the pilot house that there was smoke, and perhaps fire, below. The freight deck watchman was questioned, but reported that he saw nothing out of the way, but, when the first officer himself looked over the starboard side, he perceived smoke coming from the amidship gangway. He called the master, and in obedience to the latter's direction himself went down on the freight deck. He saw the smoke. He and others got down the fire hose, but no water came through it. In other parts of the ship, others had the same experience. No water could be obtained. The engine room force swear that the fire pump was promptly started.

The claimants suggest that all this proves that either the fire line or the hose was in bad shape in some respect, which previous and competent inspection would necessarily have discovered. There is much testimony that the ship's fire-fighting apparatus was in good order. A little more than two months before, the government inspectors had examined and tested it. It had apparently worked satisfactorily when, on the Tuesday next preceding the disaster, the ship had conducted its last fire drill. About three hours before the fire was discovered, the pump had been used in ejecting ashes. There is nothing to the

contrary, except the undeniable fact that it would not work at the one time in the 14 years of the ship's life that there was need that it should.

The petitioners suggest an explanation as to why these appliances, though in perfect order, were useless. The fire line, which was of brass, came out of the engine room at about the level of the freight deck, and then rose vertically along the starboard side of the engine room casing to the ceiling of that deck, which was, of course, the underside of the saloon deck flooring. It then, as a 4-inch pipe, branched and ran horizontally towards stem and stern. It rested on metal stirrups, which were made fast to the carlines supporting the saloon deck. The petitioners say that before an attempt was made to use the hose the flames had already so burned the carlines that a number of stirrups fell out, and in consequence the pipe itself sagged and parted. After the fire it was found broken. At some stage of such a fire it was bound to give way, but what we need to know is when it did.

Shortly after the wreck reached Baltimore, the steamboat inspector found the valves of the fire pump were opened, as they should have been, had it been properly set to work. From appearances, he thought they had not been touched since the fire. It would seem to be difficult to be certain about such a matter. A number of days had elapsed. It is possible that others had been on board before him.

In harmony with the petitioners' theory is the fact that, a very little while after the attempt to use the hose had failed, the telegraph from the pilot house to the engine room was found to have given way. It ran alongside the fire line, where the latter is supposed to have broken. Nevertheless, it is very difficult to accept the petitioners' explanation, or indeed impossible, if credence is to be given to some of their most important witnesses. Several of them testify they were on the freight deck after the time at which it is said the pump was started. They went as close as they could to the smoke. None of them saw flames at that time. If their story be accurate, they could not have been very many feet away from the place at which the pipe broke, if it broke at all. They heard no rush of water. They saw no steam, and yet, if the petitioners are right, at that very moment a 4-inch stream, under heavy pressure, must have been gushing from the broken pipe. Moreover, it is hard to understand how enough of the carlines could have been so badly burned as to permit a sufficiently large number of stirrups to give way to break the pipe, without flames making their way up through the planks of the saloon deck. At that time, and for an appreciable period thereafter, nothing of this kind took place.

The claimants argue that all this proves that something must have been badly out of order before the fire began. That conclusion does not necessarily follow. There was much smoke in the engine room when it is said the pump was started. It is possible a mistake was made, in that the wrong valve might have been turned, as, for example, that used for ejecting ashes. The evidence that the pump and the line were in good condition is very strong. The facts are inconsistent with the theory that the flames broke the line before the time

at which it was attempted to use the hose. The probabilities are that the pump was not properly set to work. If so, some one of the engine room force was lacking in the care and skill which he should have shown. Had they been exercised, the fire might have been checked before much harm was done. Even so, neither of the petitioners are thereby made liable to any of the claimants beyond the value of his, or its interest in the wreck.

No one thought of the hand pumps. The existence of the sprinkler system with which the ship was equipped was on the night in question, as for many months before, ignored by every one on board. When it was found that the fire line, as operated by the engine room pump, was useless, all thought of fighting the fire was given up. To take to the boats was all that was left. From that moment there was an end of all real direction or command. Much allowance must rightly be made for the confusing and terrifying effect of a midnight fire on shipboard, but, even so, there was on the part of the officers and crew of the Virginia a marked lack of that discipline, vigilance, and care to which the passengers were entitled, and which, had they been displayed, would in all probability have saved most of the lives and prevented much of the personal injuries for which compensation is here sought. Speaking generally, nothing was done as it should have been.

At the Virginia's weekly fire drills, it was the established custom to give, on the ship's bell, the signal first to go to the fire stations and then to take to the boats. The captain, on the night of the fire, was at all times within a few feet of the bell. He had sufficient assistance at hand; but the bell was not sounded, and it apparently never occurred to him that it should be. It is doubtful whether some of the crew knew to which of the lifeboats they should go. It is certain that few of them, and not all of the officers, went to those to which they were assigned. One lifeboat, which got away comparatively early, had on board it two or three of the crew, in addition to three officers, each of whom, according to the station bill, should have been in command of a separate boat. Several of the boats which got off later did so without any officer, and with only one or two of the crew. Plugs, oar locks, and oars were missing, overlooked, negligently or badly handled by inexperienced passengers, and were largely useless.

The Virginia remained on an even keel. Weather conditions were perfect. There was sufficient time, and yet only 6 of the 12 boats left the side of the ship, and one of them was upset as it reached the city of Norfolk. One of the lifeboats, loaded with passengers, while being lowered, broke loose and precipitated its occupants into the water. Some of them were drowned, and others injured. A subsequent inspection of the boat showed that its stern post had broken or had been pulled out.

The regulations require that each lifeboat and its tackle shall be of sufficient strength to be safely lowered into the water when loaded with its full complement of persons and equipment. What part, if any, the inexperience of those who were helping to lower it may have had in bringing about this catastrophe, it is impossible to say; but there is not enough in the record to charge the petitioners with previ-

ous privity or knowledge of any weakness in the lifeboat or in the appliances for getting it into the water.

Another provision of the regulations—that the officer or seaman who is designated to command a lifeboat shall have a list of his men, and shall see that they are acquainted with their several duties and stations —was not generally obeyed, if at all. It is unnecessary to go into further details, and to do so, in view of the probability that the confusion of the occasion has led to many erroneous statements from the witness stand, would doubtless do much injustice to individuals. There can be, however, little question that, had the lifeboats been handled by the officers and crew of the Virginia as skillfully as they should have been, few of the passengers would have died or been much hurt.

The claimants assert that the breakdown of discipline at the critical moment was the natural, if not the inevitable, result of conditions which had long existed. They point to portions of the evidence which, in their view, show that the ship's fire drills had about them more of form than of spirit. There is force in this contention. Such exercises tend to become perfunctory. It is hard, week after week, year in and year out, to throw life into practicing for an emergency which may never arise. Officers must be good disciplinarians to keep themselves and their men up to the mark in such matters. It may be doubted whether those in command of the Virginia were such; yet their experience, standing, and reputation amply justified the petitioners in employing them.

The government regulations require that different groups of boats shall be used in turns at each successive boat drill, and that the latter and inspection shall be so arranged that the men thoroughly understand and are practiced in the duties they have to perform, and that all boats and pontoon rafts on the ship, with the gear pertaining to them, are always ready for immediate use. The first officer testified that the lifeboats on the hurricane deck, numbering one-third of all the Virginia carried, were never used in the weekly drills. He said she never had men enough to man them, although he was nominally assigned to command one of them. It is quite plain that he looked upon them as intended for show rather than for use, and yet, even with them, the ship had never more than sufficient to take care of the full number of passengers and crew she was permitted to carry, and often did. On the other hand, it is certain that she had all the men the regulations demanded, and indeed, on the night of the disaster, had a few more.

At the hearing, every effort was made by the advocates for the claimants to learn what they could about the station bill, and in this, as in other efforts to get at the facts, the advocates for the petitioners lent their ready assistance. All that was really found out was that the bill of the Virginia was kept in a different way from that on its sister ship, the Florida. On the latter ship, each man, when he first joined, had a number given him. On the station bill, that number was assigned to a definite fire station, a particular lifeboat, and so on. It was not necessary to change such a station bill often, if at all. On

264 F.—63

the Virginia it is overwhelmingly proved that the men were not given numbers, and that the bill therefore should have been altered every time a new man came on board, which was on the average perhaps of once a week. It was the business of the purser or assistant purser, or perhaps of the first officer, to make these corrections. The purser said he had looked at the station bill, but was not familiar with it. It is quite certain that he did not regard himself as charged with any responsibility concerning it, and in fact never had anything to do with it. The assistant purser says that he had not. The first officer was silent on the subject. So far as the record shows, the Virginia's station bill had not been changed for 20 months, or since September, 1917, when the former purser, Mr. Thurston, left, and this in the teeth of the provisions of the regulations that special duties, in the event of an emergency, shall be allotted to each member of the crew, and that the muster list shall show all these special duties, and shall indicate particularly the station to which each man shall go and the duties which he is to perform. It was not surprising that on the night of the fire some of the crew did not know where they should go, or what they should do.

Upon the assumption to which, as already stated, the evidence points that the fire line did not give way until an appreciable time after the fire was discovered, and the failure to get water through it was due to an engine room blunder, the hand pumps might have proved valuable, had they been promptly resorted to. There was another portion of the fire-fighting apparatus which was utterly overlooked at the very time it was so sorely needed. Some years previously, upon the demand of the government, a sprinkler system had been installed on the freight deck. It doubtless cost a considerable sum, and was straightway forgotten. Everybody thought of it as the first officer obviously did of the hurricane deck lifeboats; it was there because the authorities thought it should be, but no practical man would ever want to use it.

The very existence of a sprinkler system was not known to any of the proctors or advocates on either side. The petitioners had called every one of the ship's officers and crew who could be located. They had been examined and cross-examined. No one of them said a word about it. The hearing in court began on the 16th of December. Up until the morning of the 31st 60 or 70 witnesses had been examined in open court, and the depositions of a score or more others had been read. Both sides had closed, without its ever having been alluded to. I had noticed the requirement of section 4171 of the Revised Statutes that passenger steamers should have at least two pipes of suitable dimensions, one on each side of the vessel, to carry water to the upper decks. I wondered what construction had been put upon it in practice, and I had the local inspector recalled to enlighten me. He said that for a great many years the authorities had held that a ship with but one main pipe, and that all on one side, was properly equipped, if, as was the case on the Virginia, it had, at convenient intervals, branches by which the water could be carried to other parts of the vessel. It also appeared that the inspectors had permitted, without question, the hand pumps to be connected with the fire line, so that a

break anywhere in the latter would make them, as well as the steam pump, so much useless furniture. If this were a new statute, I should at least pause before giving it the construction which the government officials and the steamboat inspectors have put upon it, but after this lapse of time fairness requires that their ruling be accepted as correct. La Bourgogne, 210 U. S. 132, 28 Sup. Ct. 664, 52 L. Ed. 973.

While testifying, the inspector spoke of a sprinkler system. Questions were asked, and it was then brought to my attention for the first time that by a provision of the official regulations going into effect on the 31st day of December, 1916, all vessels carrying passengers, which also carry freight upon a main deck accessible to passengers or crew while the ship is being navigated, shall have installed in such main deck freight space, an efficient overhead water sprinkling system. It must be reliable and efficient, and so located that the volume of discharge will be sufficient entirely to cover or blanket the freight in case of fire. It is to be installed in such manner as to be easily and quickly accessible of operation, and is to be ready for service at all times when freight or passengers are on board.

The Virginia's chief engineer was at once recalled. He said that the cargo was habitually stored under the valves, so that nobody could get to them, and he admitted that for all practical purposes this made the system useless. The chief stevedore said he always loaded the cargo so that the valves could be gotten at. He testified that the valve was at the amidship gangway on the starboard side, and there was no freight stowed there, "not in the gangway"; but, when asked to describe the sprinkler system, he said "there were pipes that ran down through the deck overhead; valves were there to turn the sprinkler system on; I have never paid much attention to that business, because it was out of my line." He also stated that "the company never gave me any instructions; only the engineer has told me about the valves there, to look out for them in the amidship gangway. I think there was a valve, but I am not positive; a valve aft of the port side at the engine room gangway. I couldn't tell you how many valves there were." On the whole, I am satisfied that the chief engineer's admission was true.

Mr. Key Compton was the federal manager of the steamboat lines for this district. He was in immediate charge of the Virginia and other vessels, and was in the habit of going aboard her on the average of two or three times a week. He admitted that he did not know particularly about the sprinkler system on the boat, and said that he took no steps to see how it worked. The superintending engineer, Mr. Webb, was the only other individual who can be said to have been a person whose privity or knowledge was that of the owner. He was examined on behalf of the petitioners. He said nothing about the sprinkler system. After its existence came out, he was not recalled. He might not have been available at the time, but no application to hear him has since been made.

It is quite possible that, had anybody on board been kept familiar with the sprinkler system, and had it been made the duty of a particular individual to go to it on an alarm of fire, it might have been of

service. From what has been said, it necessarily follows that the default of the officers and crew did contribute to the deaths and personal injuries and to the loss of passenger's baggage, so that the petitioners are answerable to the claimants therefor to at least the value of the wreck.

The Virginia went down to Norfolk one night and came back to Baltimore the next. It was never more than a few hours away from the actual observation of the executive officers of its owner, and in fact, as the testimony of Mr. Compton and Mr. Webb shows, they were frequently on board her. Under such circumstances, they must have known that not all the lifeboats were in turn used at the drills. The way in which the station bill was kept up, or not kept up, was one of the things that they should not have allowed to escape their attention. Most certainly, they made no attempt to have the sprinkler system kept useful. It follows that there was neglect in the petitioners themselves, as well as in their agents and servants, in seeing to it that the laws and regulations were obeyed. But for such negligence, the fire might have been extinguished before the cargo was destroyed. Consequently, section 4282 does not protect the petitioners against the claims of the owners of the lost merchandise.

The inspection laws and regulations were not obeyed, and this disobedience had its part in causing the deaths, the injuries to the passengers, and the loss of their baggage. Such disobedience was due in part at least to the personal negligence of the petitioners, as distinguished from that of their employés. If section 4493 means what it says, and its operation is not limited by section 4283, the petitioners are liable to the death, personal injury, and baggage claimants to the full amount of the latter's loss.

[2] In Butler v. Boston S. S. Co., 130 U. S. 553, 9 Sup. Ct. 612, 32 L. Ed. 1017, the Supreme Court said that it has never held that section 4493 took away any protection given by section 4283, and in that case it was unnecessary to decide whether it did or did not. Eight years later, the Circuit Court of Appeals for the Ninth Circuit, Judge (now Mr. Justice) McKenna being one of the sitting three, ruled that the operation of section 4493 was not restricted by anything to be found in 4283. The Annie Faxon, 75 Fed. 312, 21 C. C. A. 366. So far as I am able to discover, no court has taken a contrary view.

There is no call here to consider whether the ship owner loses his right to limit his liability merely because his employés have failed to obey the inspection laws; he being without personal default in the matter. All that need be said is that, as the authorities now are, a District Judge would scarcely be justified in holding that an owner is protected when, as in the instant proceedings, he has been himself personally negligent in seeing that the statutes and regulations are complied with, and injury to passengers and their baggage has resulted. Neither section 4283 nor 4493 has application to cargo claims. As against them, liability may be limited, unless their loss occurred with the privity or knowledge of the petitioners.

[3] In La Bourgogne, 210 U. S. 122, 28 Sup. Ct. 673, 52 L. Ed. 973, the Supreme Court said that "mere negligence, pure and simple,

in and of itself, does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute." The language was carefully guarded. In the much later case of Richardson v. Harmon, 222 U. S. 100, 32 Sup. Ct. 27, 56 L. Ed. 110, the court stated that section 4282 leaves an owner "liable for his own fault, *neglect*, and contracts." The italics are mine. In Pendleton v. Benner Line, 246 U. S. 357, 38 Sup. Ct. 330, 62 L. Ed. 770, the court said it was not disposed to disturb that very strong and deliberate intimation. In Capital Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 Sup. Ct. 292, 63 L. Ed. 631, the court approved and applied its later decisions, but declared that it very much appreciated "the danger that the act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners," and added, "We are not disposed to press the law in those directions further than the cases go." The determination in other respects to give the statute a liberal construction for the benefit of owners is shown in the latest decision. Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal, 251 U. S. 48, 40 Sup. Ct. 66, 64 L. Ed. ——.

The question is very close. I am not persuaded that the general statement in Richardson v. Harmon was intended to modify or over-rule the more precise language used in La Bourgogne. There is no conflict between them. "Mere negligence, pure and simple, in and of itself," does not establish privity or knowledge. To do that, there must be something more than mere thoughtlessness or casual oversight. But, as Richardson v. Harmon declares, there are neglects that will. Perhaps the owner cannot deny privity or knowledge, if the disaster happened in whole or in part because he more or less consciously took a chance or closed his eyes to something he did not want to be bothered about, or because in some other way he fell short of what a fair-minded, well-informed, and impartial man would feel was his moral duty in the premises.

[4] After much consideration, and a great deal of hesitation, I have concluded that the negligence of the petitioners does not amount to privity or knowledge, within the meaning of those words as used in section 4283. The conclusion of the whole matter is that they may limit their liability as against cargo claimants, but not as against the claims of passengers or their dependents for deaths, personal injuries, or baggage.