### HOSKYN & CO., Inc., et al. v. SILVER LINE, Limited.

### INTERNATIONAL STANDARD ELECTRIC CORPORATION et al. v. SAME.

### CHINA GENERAL EDISON CO., Inc., v. SAME.

### Nos. 323–325.

Circuit Court of Appeals, Second Circuit.

June 8, 1944.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and Charles W. Harvey, both of New York City, of counsel), for libellants-appellants.

Lord, Day & Lord, of New York City (Thomas F. Daly and Charles W. Merritt, both of New York City, of counsel), for respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

CHASE, Circuit Judge.

When the M/V Silvercypress which was owned and operated by the respondent was discharging cargo at Ilo Ilo, P.I., on January 13, 1937, while on a voyage from New York to points in the Far East, a fire started at the No. 2 auxiliary Diesel engine on the starboard side of the engine room. It could not be brought under control and soon the ship was burning rapidly. The vessel was destroyed and so was a

great part of her cargo, though some of it was saved in more or less damaged condition and some of the portion saved was carried on to destination.

A large number of cargo owners and underwriters filed in all eighteen libels against the appellee. These suits could be and were classified and grouped according to the legal principles which were controlling. Four typical cases were selected for trial with the understanding that the result would govern the disposition of the other like suits. In one of these four the libellant prevailed and the respondent did not appeal. In each of the other three a final decree dismissing the libel was entered for the respondent and the libellants have appealed from each such decree. The three appeals were consolidated for hearing in this court. In addition to the question of liability for physical fire damage which is common to all, questions are raised as to payments required for on-carriage of salvaged cargo and general average deposits.

All the parties agree, however, that the decisive issue on each appeal is whether the Fire Statute, R.S. § 4282, 46 U.S.C.A. § 182, which was pleaded by the respondent, is a defense to these actions. As they are all satisfied with the provisions of the decrees regarding the disposition of each particular kind of claim after the main issue has been decided we will confine this opinion to that subject.

■ The statute provides immunity for the ship owner from liability for fire damage to cargo "unless such fire is caused by the design or neglect of such owner." Earle & Stoddart, Inc., v. Ellerman's Wilson Line, Ltd., 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403; The Ida, 2 Cir., 75 F.2d 278. As there is no claim or reason to believe that the fire was caused by the design of the owner, the issue is narrowed to whether or not it was caused by the owner's neglect. The burden of proving that the neglect of the owner did cause the fire rested upon the libellants, and the question here is whether the trial judge's finding that they did not discharge that burden was justified. Globe & Rutgers Fire Ins. Co. v. United States, 2 Cir., 105 F.2d 160, certiorari denied 308 U.S. 611, 60 S.Ct. 175, 84 L.Ed. 511.

In the engine room of the Silvercypress were two Diesel engines which were the main power plant of the vessel. They were not running when the fire broke out. There were also four auxiliary Diesels connected to generators which supplied the electricity for the operation of the machinery of the ship as well as for lights and cooking. On a voyage just before the one on which this fire occurred, one of these auxiliary engines had caught fire but the blaze had been readily extinguished. Only temporary repairs were, thereafter, made to the auxiliaries before the vessel sailed from New York on her last voyage although, as the trial judge found, the owner had been advised that repairs were needed in addition to those made. It was accordingly found, and is not now seriously disputed, that the vessel was unseaworthy when she sailed and continued to be unseaworthy up to the time of the fire, and that such condition was due to the neglect of the owner. Consequently the issue is further narrowed to the question whether it was shown that the neglect of the owner which allowed the No. 2 starboard auxiliary to be used while it remained in the condition that made the ship unseaworthy caused the fire. Compare, Christopher v. Grueby, 1 Cir., 40 F.2d 8.

This was an extremely difficult question to resolve in point of fact because the engine room was gutted and when it could be entered after the fire so much damage had been done that no definite evidence concerning the cause of the fire could then be obtained.

■ Some facts as to conditions in the engine room just before the fire were proved, however, and there was evidence that a relief valve in one of the engine's cylinders then opened and let out hot gases and sparks. The libellants directed most of their energies to attempting to show that the fire was caused by the spraying of oil from a small intake pipe against the hot exhaust pipes and the hot cylinder head when excessive vibration caused the pipe to break. Yet there was no evidence that such a pipe did in fact break before the fire started. The respondent put forth a contrary theory supported by the testimony of its expert to the effect that an overhead fuel pipe in the engine room might have sprung a leak, with results later to be given. Yet there was no credible evidence that such a leak did occur so all was left to speculation. Such an occurrence, however, could not reasonably be connected with the owner's proved neglect to repair the engines. So there was expert testimony pointing to a possible cause of the fire

connected with the owner's neglect to put the auxiliaries in good repair after notice and testimony just as expert pointing to a possible cause unconnected with any neglect of the owner. There was also evidence of an unusual loss of lubricating oil but that, too, indicated only a lack of engine repair and mostly in respect to the main engines which were idle when the fire started. The trial judge could not find whether either theory as to the cause of the fire was the correct one, or what did in fact cause it.

The word "theory" has been used deliberately for it is apparent that no one can do more on the evidence in this record than to speculate, and right there the weakness of the libellants' cause is revealed. The statute placed upon them a burden it was impossible to carry, as will now be seen from a discussion of the available and proved facts in connection with the operation of a Diesel engine of the multiple-cylinder four-cycle type of the auxiliaries in this vessel.

The ship was about seven years old when she burned. She had been built by Harland & Wolff and her engines were of the Burmeister and Wain kind, constructed by the shipbuilders. No fault is found with their type or construction and when in repair they were suitable engines for the use to which they were put.

Such engines have reciprocating pistons which make four up-and-down movements in the cylinder for each power stroke and two for each revolution of the crank shaft. They are started by compressed air from tanks, and as soon as they begin to fire the compressed air supply is automatically cut off. It will be adequate for present purposes to describe their operation after they are started. On a down stroke of a piston, air is sucked in from the engine room through an air intake. Then the intake valve closes and on the up stroke the air within the cylinder is compressed so much that it becomes hot enough to ignite the fuel that is at the right moment injected under even higher pressure. The burning of this fuel causes the gas expansion that furnishes the energy for the power stroke, and on the next upward movement of the piston the burned gases together with sparks and hot carbon, if any, are pushed out through the exhaust valve which opens at the proper time for that purpose. Then this four-cycle operation is repeated so long as the engine con-

tinues to run. The operation of a Diesel engine like this auxiliary is in general like that of the common four-cycle automobile gasoline engine, except that a Diesel has no electric spark plugs. It is advisable and common practice to provide each cylinder with a relief valve which will open at a fixed pressure setting, usually two hundred pounds above the normal cylinder pressure, if for any reason internal pressure rises so high, and the No. 2 auxiliary had such relief valves in its cylinders.

The fuel charge was forced into this Diesel engine under about 3500 pounds pressure through a pipe leading to the intake valve. That valve and the exhaust valve were opened in response to the action of a cam shaft which was turned at a speed always related to that of the crank shaft of the engine by means of a chain running over sprocket wheels, one on each shaft. This caused the valves to open at the proper time whatever might be the speed of the engine. This is what is called timing. The valves were closed after each timed opening by a spring. As there is inevitably a little time lag between the injection of the fuel load and the ignition of the fuel in the cylinder, it is customary to time the opening of the intake valve some degrees ahead of the highest point of piston travel so that the fuel will begin to burn at the top of the piston stroke. When the intake valve opens either too early or too late the fuel is ignited correspondingly early or late and the results are a decrease in power, excessive vibration and overheating which will be greater or less in degree as the timing is more or less faulty, up to the point where it may be so far from normal that the engine cannot run at all. The timing mechanism of this engine was not thoroughly repaired before the beginning of the voyage though it was kept in running repair up to the time of the fire. A common cause of faulty timing in an engine of this kind is the stretching of the chain above mentioned, and it is difficult to adjust it when that stretching is less than the length of one of the links. Indeed, an adjustment may be made by means of the chain alone only to the extent of one or more links either by taking them out or, more easily, by moving the chain to that extent on one of the sprocket wheels other than the one usually inserted merely to keep the chain sufficiently tight on the sprocket wheels. When adjustments more difficult to make are required, facilities not available on the ship are needed. As

is customary, the speed of the auxiliary was controlled by a governor which adjusted the fuel supply to make it idle at a fixed number of revolutions per minute and to vary the amount automatically as the engine worked to keep the speed constant or nearly so. There was some evidence that this governor deliberately was made inoperative for a while during the voyage to prevent its cutting the fuel charge at all but if that was the fact, and it is doubtful that it was because the electrical system to which the engine was connected required controlled engine speed, that abnormal condition had been remedied long before the fire.

However, this lack of repair in respect to timing was found to be due to the neglect of the owner and that fact is established for present purposes. It made the engine less efficient and more apt to vibrate and to get overheated. If, therefore, the libellants could prove that the fire was started as a result of faulty timing due to the owner's neglect, the fire statute would be no defense to this action.

They attempted to do that in this way. After showing the trouble in this regard which had been experienced on the previous voyage and the temporary repairs which had been made, they produced experts who testified to the following plausible theory. These witnesses said that if the timing was faulty enough and the engine ran long enough while in that condition, not only might it have become excessively hot but the vibration might have caused a leak in the fuel feed pipe or its connections through which the fuel under 3500 pounds pressure was flowed into a cylinder through the intake valve. If this did happen fuel oil might have been sprayed onto the exhaust pipes, which were normally at a temperature higher than the flash point of the fuel oil, or onto the cylinder head whose temperature might also have been above the flash point of the fuel oil. If the oil had been so sprayed, a fire, of course, would have been the result. But there was no evidence that the faulty timing did in fact overheat the engine just before the fire or that there was vibration which in fact caused a leak in a fuel pipe in the manner described.

Another theory equally plausible was developed by the respondent in the testimony of its expert. There was an overhead pipe through which fuel oil was brought to the engine under low pressure. It was shown that leaks sometimes occurred in pipes of this sort for no apparent reason— a pin hole might open or a packing become leaky. A bit of hearsay in a report by one of the engineers that there was such a leak was not given credence by the judge however, and there was nothing else to put the idea above the level of surmise. Had this pipe sprung a leak that allowed enough oil to spray out, that too might have been ignited by striking the hot exhaust pipes. But the theory of this expert went further and accounted for the opening of the relief valve. He said the oil sprayed from the leaking overhead pipe might have saturated the air around the air inlets of the engine so that when the cylinders were filled with that air on the air intake stroke of the pistons they were partially charged with fuel. One of them might have been so precharged in this way that when the regular fuel charge entered through the intake valve and the fuel was ignited there was an excess of pressure due to this overload of fuel beyond the limit at which the relief valve was set. That would, of course, cause the relief valve to open, and the emission of some of the exhaust through this opening would cause the fire. As the owner was chargeable with no neglect whatever in respect to the overhead fuel pipe or its condition, if the fire was caused by a leak at that point the fire statute as pleaded was a good defense.

It is no wonder that on this sort of evidence the trial judge could not decide which, if either, of these theories showed how the fire was caused or find what as a matter of fact did start it, and he had to leave that vital question unanswered. There is, therefore, nothing in this record which shows reversible error in respect to any of the decrees.

On the contrary there is ample support for the negative finding that the cause of the fire was not proved. Consequently it was not shown that any neglect of the owner caused it and such a finding is to be given effect on appeal. Compare Petterson Lighterage & T. Corp. v. New York Central R. Co., 2 Cir., 126 F.2d 992. That leaves the libellants short of having proved a cause of action, for the unseaworthiness of the ship did not alone deprive the respondent of the benefit of the fire statute. Globe & Rutgers Fire Ins. Co. v. United States, supra.

Decrees affirmed.