## FIDELITY–PHENIX FIRE INS. CO. OF NEW YORK v. FLOTA MERCANTE DEL ESTADO, Etc.
### No. 820.

United States District Court
E. D. Louisiana, New Orleans Division.

Feb. 12, 1952.

862

Deutsch, Kerrigan & Stiles and Harry F. Stiles, Jr., all of New Orleans, La., for libelant.

Kirlin, Campbell & Keating and L. de Grove Potter, all of New York City, Chaffe, McCall, Toler & Phillips and Leon Sarpy, all of New Orleans, La., for respondents.

WRIGHT, District Judge.

Libelant is a cargo underwriter and assignee of all right, title and interest in the claim of La Prensa against the respondent, Flota Mercante Del Estado, an agency of the government of Argentina. The claim in question arises from damage to a shipment of 1464 rolls of newsprint shipped by La Prensa on board the steamship Rio Gualeguay which is owned and operated by respondent. The damage was caused by fire and respondent has pleaded in bar the fire statute which provides: "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner." 46 U.S.C.A. § 182.

On December 2, 1943 Montmorency Paper Company delivered to the steamship Rio Gualeguay at the Port of New Orleans 1464 rolls of newsprint consigned to the order of the shipper, La Prensa, for delivery to Buenos Aires, Argentina. On December 3, at about 12:15 A. M. after the rolls of newsprint had been loaded with other general cargo in hold No. 2 of the Rio Gualeguay, smoke was observed coming from that hold. Upon examination a fire was discovered, which fire together with efforts to extinguish it, caused the damage and destruction of 1048 of the 1464 rolls of newsprint.

The steamship Rio Gualeguay is a single deck vessel with a raised forecastle, bridge deck and poop. She has a net tonnage of 6173, her dimensions being 391 feet in length, 49 feet in breadth with a hold depth of 27 feet. She has two cargo holds forward. Hold No.2 is divided into two compartments by a wooden bulkhead run athwartships. The forward compartment was used for cargo and the after compartment or cross bunker was used to carry a reserve supply of coal. She was built in Montreal, Canada, in 1918 and was given an A-1 classification in Lloyds. She was acquired by the respondent in August 1941 from the Italian government. She was last surveyed by Lloyds in Genoa in 1939 and would have been up for her next survey in February 1943. However, in June, 1942 at her owner's request she was withdrawn from class.

At all pertinent times the Rio Gualeguay was moored at the 7th Street wharf in the harbor of New Orleans. At approximately 4:30 on the afternoon of December 2, 1943 the hatch serving No. 2 hold was closed and battened down after the hold had been loaded with general cargo consisting of cigarettes, tobacco, tin plate, machinery,

barrel staves, bricks, veneer and the shipment of 1464 rolls of newsprint. She was scheduled to depart the Port of New Orleans on the morning of December 3rd. The fire at 12:15 A. M. December 3rd intervened and delayed her departure.

Immediately on discovery of the fire, the Fire Department for the City of New Orleans was called as was the harbor fire tug Deluge. Both the Fire Department and the Deluge arrived promptly but were not allowed to open No. 2 hatch immediately on arrival. The ship's officers had decided to attempt to smother the fire by use of the ship's steam smothering system in order to prevent excessive water damage to the remaining cargo. After a delay variously estimated at from ten to thirty minutes the attempt to smother the fire with the steam smothering system was abandoned. The hatch was opened and both the Fire Department and the Deluge began to bring large amounts of water to bear on the fire which appeared to be primarily in the tobacco loaded in the after upper part of No. 2 hold, starboard side. Both the Fire Department and the Deluge continued to pump water into the No. 2 hold at the rate of nine tons per minute until 2:30 A.M. when it was decided, because of concern for the stability of the vessel by reason of the excessive amount of water then in No. 2 hold, to take the vessel down river to Chalmette where she could be beached. The vessel was removed from the wharf by the Deluge and an assisting tug and beached at Chalmette where the Deluge again turned her hoses into No. 2 hold until the water in the hold was almost level with the deck.

Libelant realizing its burden under the fire statute has undertaken to prove that the fire was caused by the design or neglect of the owner of the Rio Gualeguay. It predicates its proof on three propositions. 1. The fire originated through spontaneous combustion of the coal carried in the cross bunker of the Rio Gualeguay. 2. This spontaneous combustion fire was caused by the improper construction and design of this cross bunker and particularly the wooden bulkhead which separated the cross bunker from No. 2 cargo hold. 3. The Rio

Gualeguay was unseaworthy by reason of the defective construction and design of her steam smothering system and by reason of improper drainage in her No. 2 hold caused by the construction of the wooden bulkhead. Libelant contends that if the evidence establishes these three propositions it has successfully undertaken its burden of proving that the fire was caused by the design or neglect of the owner of the vessel. In this contention libelant is correct. Unfortunately, however, none of the three propositions has been proved.

Much of the record is taken up with a description of the wooden bulkhead separating cargo hold No. 2 from the cross bunker. This wooden bulkhead was constructed of 3″ athwartship deals or planking fitted in between the flanges of I-beams on either side of the ship and H beams near the ship's center. In other words, at the place where the wooden bulkhead was fitted there were four vertical steel stanchions running from the deckhead to the tank top. The I-beams or stanchions were on either side of the ship. The H beams were near the center of the ship approximately fifteen feet apart. These beams gave the bulkhead its primary support. In addition there were 8 x 8 vertical supports fitted in pairs on either side of the bulkhead and bolted through, together with three 11 x 11 athwartship strengthening pieces. The face of the bulkhead on the cargo side was entirely covered with prepared paper. This bulkhead separated the cargo in No. 2 hold from some 600 tons of coal in the cross bunker. The coal was piled approximately 43 feet high, 27 feet from the tank top to the main deck, through an open hatch in the main deck up 11 feet to the bridge deck, through an open hatch on the bridge deck up again approximately 5 feet on the open deck.

Libelant's point with reference to the alleged unseaworthiness of the wooden bulkhead seems to be that a wooden bulkhead should not be used in connection with the stowage of coal and if one is used it should be airtight. The evidence shows, however, that it is quite customary in coal burning vessels of this type to create a reserve bunker in the No. 2 cargo hold by the

use of a wooden bulkhead. Consequently it cannot be said that the use of the wooden bulkhead as such is improper; otherwise the hundreds of vessels so fitted would have to be declared unseaworthy. As to the bulkhead being airtight, it is doubtful that a wooden bulkhead can be made airtight. The use of the prepared paper on the cargo side of the bulkhead made it dust tight and as airtight as reasonably required. The evidence shows that this bulkhead was suited for the purpose for which it was designed and that it complied with the requirements of ordinary prudence. It was of the type in common use for bunkers and it cannot be said that because the owner of the Rio Gualeguay allowed a bulkhead of this kind to be used in its vessel that owner is negligent. In any event there is no evidence to show that any deficiency on the part of this bulkhead contributed in any way to the cause of the fire. Earle & Stoddart v. Ellerman's Wilson Line, D.C., 45 F.2d 231, affirmed, The Galileo, 2 Cir., 54 F.2d 913, Id., 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403.

In support of its theory of spontaneous combustion libelant relies on the construction of the wooden bulkhead and the testimony of two experts who have never seen the Rio Gualeguay, one of whom appears to be primarily a naval architect, the other an engineer. These experts testified that in their opinion the spontaneous combustion of the coal took place in the cross bunker at a point three feet below the main deck, five feet from the wooden bulkhead and slightly to starboard of the middle line of the vessel. This location as the point of spontaneous combustion in the coal has no scientific explanation. It appears that it was chosen by the experts because it is approximately at the same level in the bunker as the cargo which burned was in the No. 2 hold. The experts suggest that after combustion had taken place the fire found its way over toward the wooden bulkhead which it heated or burned through to such an extent that the cargo on the other side in hold No. 2 caught fire. These experts theorize that since coal can be self-heated by oxidation, the mass of the coal became heated and just sufficient air seeped through the bulkhead and down the natural chimneys formed in the coal by the $8 \times 8$ vertical supports in the bulkhead to cause spontaneous combustion.

The evidence shows without question that spontaneous combustion can take place in coal if ventilation of the interior of the mass is permitted to a degree sufficient to allow oxidation of the coal but insufficient to carry off the heat generated by the oxidation. It further shows, however, that spontaneous combustion is more likely in coal which has been in a bunker for a considerable period of time or in that part of the bunker where new coal has been loaded over old coal. Neither condition existed here because the coal in which libelant's experts say the combustion occurred was new coal having been loaded aboard the vessel just five days prior to the fire.

Against the possibility of the spontaneous combustion in the coal projected by the libelant's experts is the weight of the evidence in this case. The record shows no evidence whatever of fire in the coal. The coal in the bunker was the same after as before the fire except for a little wetting. It was completely undisturbed except for a few pieces which had fallen into No. 2 hold through a hole burned in the bulkhead. No one even smelled coal burning. No clinkers, ashes or burned coal of any kind were found in or on the vessel after the fire. After the fire every ton of the coal was unloaded from the cross bunker into a barge and no clinkers, ashes or burned coal were found. The fire as seen by every one who attended it was in No. 2 cargo hold. It was into hold No. 2 that both the Fire Department and the Fireboat Deluge pumped the water. There is no suggestion in the record that water was pumped on any part of the coal at any time. Examination after the fire showed that the fire was in the tobacco and the newsprint; that the deck and shell plating of the ship in the vicinity of the tobacco and newsprint and forward of the bulkhead had buckled from the heat of the fire; that there was no buckling of any kind in the vicinity of the bunker. The bulkhead

was thoroughly burned on the cargo side, and not at all on the bunker side except in two small places where the fire had burned through.

It is true that the cause of the fire remains undetermined. It was libelant's burden, however, to prove how the fire originated and further, that the cause of the fire was the design or neglect of the owner. Libelant has not remotely borne this burden. Nor can it be comforted by the fact that the cause of the fire is still unknown. Until it proves how and where the fire started, obviously it cannot show that the owner's negligence caused it. Earle & Stoddart v. Ellerman's Wilson Line, supra; Hoskyn & Co., Inc., v. Silver Line, Ltd, 2 Cir. 143 F.2d 462.

The possibility libelant suggests as a cause of the fire appears much less likely than several other possibilities which have been suggested, such as for example, the dropping or throwing of a lighted cigarette into the hold, inadvertently or otherwise. It is true that the hatch serving No. 2 hold was closed and battened down between 4:30 and 5:30 on the afternoon of December 2nd and that the fire was not discovered until midnight the same day. This length of time alone, however, would not negative the possibility of a smoldering fire in the tobacco or cigarettes not being discovered for several hours, particularly in a ship's hold with the hatch covered and battened down. Other possible causes of the fire may be cited, but it will serve no useful purpose to extend this conjecture. The fact is the cause has not been proved and it was libelant's burden so to do.

■ In addition to its contention of unseaworthiness of the wooden bulkhead as the cause of the fire, libelant also contends that the vessel was unseaworthy by reason of a defective steam smothering system and a lack of drainage in No. 2 hold. These contentions are easily disposed of by the evidence. There is no substantial proof that the steam smothering system did not operate properly. Even if it failed to operate properly, no neglect of the owner is shown because no defect in the system is shown. The fact that it failed to put out the fire would not necessarily indicate im-

proper function or neglect on the part of the owner. Steam smothering systems in ships are notoriously poor at putting out fires, particularly slow burning fires which have gained considerable headway. It was proper for the ship's officers to use the steam smothering system first in an effort to prevent excessive water damage to the cargo. The fact that this effort failed in itself shows no evidence of negligence on the part of the owner.

■ The argument with reference to defective drainage in No. 2 hold has even less basis in the evidence. The evidence shows without question that No. 2 hold did drain. Obviously the pumping system was not able to drain the water off as fast as it was poured into the hold by the Fire Department of the City of New Orleans and the Fireboat Deluge. But within several hours after the pumping ceased the hold was drained. Apparently this contention of libelant was based on lack of information concerning the ship's construction. It is true that there was only one bilge outlet for No. 2 hold and the cross bunker, that outlet being under the cross bunker in the middle of the ship. But it is not true that the wooden bulkhead blocked the drainage from hold No. 2 to the outlet under the cross bunker. The wooden bulkhead was not rested directly on the tank tops as libelant assumes but was resting on the ceiling over the tank tops under which ceiling water from No. 2 hold drained under the bunker and into the outlet.

Possibly the only serious criticism which can be made of the respondent in this case is that no testimony was taken from any member or officer of the crew of the Rio Gualeguay either by deposition or in court. The log of the vessel and the Master's protest, both of which outlined in full the circumstances surrounding the fire, were introduced in evidence by the libelant. Perhaps respondent felt that the officers and crew could add nothing to the information contained in the log and the protest. Nevertheless, it would have been well to have the testimony of at least the chief officer who was the senior officer aboard at the time of the fire. On the other hand libelant cannot take too much comfort from re-

spondent's position in this regard because libelant failed to produce any testimony from its own cargo surveyor, who was on board the vessel immediately after the fire and who obviously could have given some relevant testimony concerning the 'damage wrought by the fire.

Decree for respondent.