### THE W. C. FRANZ.

### HALLET CAREY SWART, Limited, v. ALGOMA CENT. & H. B. RY. CO.

District Court, W. D. New York.
Feb. 17, 1933.

· Bigham, Englar, Jones & Houston, of New York City, and Burke & Desmond, of Buffalo, N. Y., for libelant.

Brown, Ely & Richards, of Buffalo, N. Y. (Laurence E. Coffey and W. Alexander Eldridge, both of Buffalo, N. Y., of counsel), for respondent and claimant.

ADLER, District Judge.

The steamer W. C. Franz with a cargo of wheat belonging to libelant sailed from Port Arthur, Ontario, for Buffalo, on October 22, 1929. She was duly inspected before sailing. I find that her officers and crew were competent. Immediately after leaving Port Arthur she ran into heavy weather and proceeded as far as Thunder Cape, but the weather was considered too heavy to proceed farther and the ship ran into Thunder Bay and anchored, where she remained until the morning of October 24th, when she proceeded on her voyage to Buffalo. On the arrival of the Franz at Buffalo, it was found that about twelve hundred bushels of wheat in hold No. 3 and a small quantity of wheat in hold No. 2 was damaged by water. Cargo hold No. 3 was located next to the engine room space and separated from it by a watertight bulkhead. On the floor of the engine room, at the bulkhead between the engine room and No. 3 cargo hold, on the starboard side, is a manifold slightly above the floor and from its top a pipe leads to a six-inch disk in the bulkhead valve, controlled by a wheel, and from that valve there is a suction pipe into No. 3 hold. From the underside of the manifold, suction pipes lead to the three starboard tanks and to the tank under the engine room. On these pipes are six-inch disk valves down in the manifold controlled by wheels on top of the manifold.

The valve in the cargo suction pipe must be kept closed at all times while cargo is on board. It is equipped with a telltale valve so that if there is a leakage past the main valve and the water is running into the cargo suction pipe, there will be a stream of water discharged through the telltale valve into the engine room, thus warning the engineer that water from the manifold is finding its way into the cargo hold. The ship's bilge ceiling was not water-tight, but it appears that the construction of the ship met the requirements in this respect of a Canadian inspection and also of the American Bureau of Shipping.

The damage to the grain is admitted, but claimant claims exemption by virtue of the Canadian Water Carriage of Goods Act under section 6 thereof, which corresponds with the first clause of section 3 of the Harter Act (46 USCA § 192).

The contention of the claimant is that the water was let into the cargo hold by the assistant engineer, who testified that he opened by mistake the valve of the cargo suction pipe instead of the valve to the ballast tank. He said that it was his intention to open the valve of the pipe leading to No. 3 starboard ballast tank in order to suck out the water in the bottom of the tank; that he then started the ballast pump, and turned on the sea cock to prime the pump. That after about two minutes he noticed that he had opened the wrong valve, and that under these circumstances water ran into the cargo hold. He said he did not notice water coming out of the telltale valve, although the telltale valve discharged on top of the manifold. It also appears that the wheels controlling the valves were clearly marked and that the assistant engineer, who had altogether fourteen years' experience, had been acting as assistant engineer on the Franz for several months. The Franz carried but two engineers, the chief engineer and assistant engineer spelling each other in the engine room. It also appears that the wheel controlling the valve leading to the ballast tank which was the one the assistant engineer should have opened was located on the manifold and that in order to turn the wheel it was necessary to bend down to grasp it. On the other hand, the wheel controlling the valve in the cargo suction pipe which is the one he said he opened by mistake is located about waist-high at the bulkhead, and it was not necessary to bend over to operate the wheel. The assistant engineer testified he did not at the time tell any one of the mistake that he made, and when the chief engineer questioned him with reference to the valves, he denied that he had opened the valve in the pipe leading to the cargo hold. He continued in service on the Franz, and the testimony is that he

did not tell any one of the mistake that he made until one year later.

In the meantime in the protest made by the captain shortly after the accident he stated that "on examination it was discovered that water had got into hold No. 3 through the ballast suction pipes by reason of a valve in the manifold not closing properly and allowing water to enter the cargo space." Later on and about five months after the voyage, the chief engineer made a declaration at Toronto in which he offered several explanations as to the cause of the water getting into the cargo. In this declaration he advanced the theory for the first time that the second engineer might have opened the wrong valve. Up to this time that theory had apparently not been advanced and it was more than six months later that the second engineer told the chief engineer, as they testified on the trial, that he made that mistake.

I am not disposed to credit the testimony of the second engineer to the effect that he opened the valve in the cargo suction pipe at the time and under the circumstances as he related it. He was perfectly familiar with the location of the valves and according to his own testimony they were clearly marked. In order to open the one into the ballast tanks, the one he said he intended to open, he had to bend down. The other one, the one he said he opened by mistake, was almost directly before his eyes without bending down. He said he did not hear or see the water coming out of the telltale valve. That seems quite incredible under the circumstances, because with the quantity of water that must have been going through the pipe in order to wet the cargo as much as it was wet, there must have been a steady flow of water from the telltale valve splashing down on the manifold for at least two minutes according to his own testimony. Furthermore, this statement of what he did was not made until a year after the time of the damage to the cargo. I do not think that he made the mistake as he said that he made it, and will therefore discard his testimony.

When cargo is received in good condition and is delivered in bad order, a presumption of negligence arises, casting upon the carrier the burden of showing that the injury arose from an excepted cause. If the matter remains doubtful, the carrier is not excused, and this is true, whether the doubt exist as to the nature of the injurious occurrence or the sufficiency of the cause assigned.

The Edwin I. Morrison, 153 U. S. 212, 14 S. Ct. 823, 38 L. Ed. 688, The Rosalia, 264 F. 285 (C. C. A. 2d), Herman v. Compagnie Generale Transatlantique, 242 F. 859 (C. C. A. 2d).

[3] My conclusion is that the claimant by his proof upon the trial has not brought himself within the exception of the Canadian Water Carriage of Goods Act, in that he has not proved that the water found its way into the cargo from a fault or error "in the navigation or in the management of the ship."

A decree for libelant in accordance with this opinion may be submitted.