## THE INDIEN.
### No. 3664–M.

District Court, S. D. California, Central Division.
Aug. 23, 1933.

Sawyer & Cluff, of Los Angeles, Cal., and Single & Single, of New York City, for libelant.

Young, Lillick, Olson, Graham & Kelly, of Los Angeles, Cal., for claimant and respondent.

McCORMICK, District Judge.

This is a libel in admiralty against the Danish motorship Indien for cargo damage. No jurisdictional issue is urged as to the sufficiency of the parties litigant, or as to the fact that the cargo, to which libelant was entitled to delivery upon its arrival in Japanese ports, was damaged on the voyage across the Pacific Ocean from Victoria, British Columbia. The defenses interposed by the claimant and owner, which has duly appeared, are special and are to the effect that the ship was in all respects seaworthy and that due diligence was exercised to make her so before the voyage commenced; that the damage to libelant's merchandise was caused by perils of the sea or fault and error in navigation and causes beyond their control; and that under the terms of the charter, pursuant to which the cargo was shipped, as well as under section 3 of the Harter Act (title 46 USCA § 192), they are exempted from liability of damage.

The shipment in question, according to the contract of affreightment or charter, as it is termed in the document, consisted of 6,094 tons of ammophos fertilizer in bags. It was taken aboard the Indien on the east coast of the United States, and the shipping contract provided that inasmuch as the shipment in question did not load the ship she was to have liberty to carry additional cargo for others that her owners and disponer might obtain at ports in the United States and Canadian North Pacific en route to Japan. Upon arrival at Nanoose, British Columbia, on January 30, 1929, the Indien received aboard further cargo in which libelant or the consignors of the ammophos have no interest whatsoever. This cargo was heavy lumber called "Jap squares." It contained 1,183,847 board feet of this heavy timber that ran from 15' to 40' long and up to 24 x 24'' square. These squares or poles were loaded in the 'tween-deck spaces, but were more than could be carried that way. The result was that 425,343 board feet of such squares was built into a deckload on the vessel's awning deck. This deckload was superimposed upon dunnage and when completed it ranged from 5 to 6 feet high on the after deck and about 6 feet high on the forward deck. This deckload was firmly lashed in place with the usual chain lashings, tightened with turn buckles, and on the evening of February 1, 1929, the loaded ship sailed from Nanoose, British Columbia. She put in at Victoria the next morning for clearance and to obtain a supply of fresh water, and after taking on 82 tons of fresh water she sailed from Victoria on her voyage across the Pacific to Japanese ports. Taking the northerly or great circle course, she encountered nothing significant until February 7th, when the vessel began to experience the turbulent seas and violent winds that are to be expected by mariners in the North Pacific in February. The rough log shows that wind conditions from February 7th to the afternoon of February 9th, according to the Beaufort Scale, ranged from 6 (strong breeze) to 11 (storm), and the officers of the ship testified that at times on February 9th especially there were hurricane gusts, although neither the rough log nor the deck log show any such wind velocities at any time during the voyage, and it is noticeable that the rough log where it shows the maximum wind scale of 11 on February 9th bears evidence of erasures which have not been creditably explained, and the captain's voyage report shows a wind force of 9 on February 9th and discloses no higher wind scale at any time during the voyage. It also appears from the ship's log that on February 7th, 8th, and particularly the 9th, until the afternoon of that day, the Indien rolled and pitched heavily and shipped much water over the deckload, sometimes completely burying the aft part of the ship and poophouse. So destructive was the wind and wave that on February 9th two houses of the ship stores that were standing on the aft boat deck and lashed to the ship's stanchions and to a ventilator were carried away, the railing was bent,

and an awning stanchion was also carried into the sea. Considerable other damage was done to the ship's equipment that was carried upon the boat deck and especially the aft part thereof. Conditions became so alarming that about 8 a. m. on February 9th the ship was taken off her course and put head on to the seas and wind with engines going between slow and half speed until later in the afternoon, when the storm subsided and she was put back on her former course and proceeded regularly, although thereafter the log shows that she pitched and rolled hard and shipped very much water, particularly over the deckload aft. During this storm on February 9th the deck cargo of "Jap squares" on the after deck, directly over the holds in which the ammophos was stowed, was being lifted clear of the deck, and it is not improbable from the evidence that it was this element that produced and caused the damage to the cargo of ammophos. The log of February 10th offered in evidence by respondent and claimant recites:

"It was supposed that some rivets must have gone loose in the ships side during the bad weather, but trying to sound the starboard No. IV bilge, notwithstanding the continuously bad weather, it was found out, that the standing pipe cover was off, so that the water must have run down this way, the ship constantly shipping much water, and having about 3 degrees list to starboard, so that the sounding pipe continually was below the surface of the water. The cover was found in the scupper further forward.

"Last time the bilges had been sounded was on Friday morning at daybreak and the sounding was put down in the sounding book as usual.

"Owing to the bad weather it had been impossible to sound on Saturday, on this account there had been pumped from the bilges on Saturday evening during the 2nd engineer's watch, and according to his report no water had been in the bilges at that time. Judging by this the cover must have gone off after 8:00 p. m. on Saturday.

"It is supposed that it has been loosened by a piece of dunnage-wood lying close to the sounding pipe, so that the seas continually must have been carrying it against the pipe ends in a socket about 2 inches above the deck on top of the cover sits not let down into it, but with its circumference in line with the outside of the sounding pipe—without having the possibility to float away—sticking so far underneath the deck cargo—but without that the deck cargo rested on it—that it could not escape over the ships side, the latter being about nine inches high, and neither forward nor abaft, there sticking against an airpipe and a stay and here against a fair leader.

"This piece of wood was on top of another piece lying fore and aft, so that these two pieces formed a cron, and in a way made a lever, which with its short arm pointed upon the sounding pipe, and in the past two days bad weather, when the deck cargo sometimes was being lifted clear of the deck, may have acted as that upon the cover.

"An examination of the cover and the sounding pipe found them to be in order. The carpenter who does the daily sounding, declares to have screwed the cover well down last time he had sounded, notwithstanding that the ship shipped some water at that time."

It is indisputable, and in fact respondent admits, that the direct cause of the damage to the libelant was the dislodging of the sounding pipe cap. The crucial and paramount question for decision is: What caused the sounding pipe cap to become dislodged? If it was dislodged because of dangers of the sea, acts of God, or faults or error in navigation, or in the management of the ship during the voyage, as such terms are applied in maritime law, and if moreover it is shown by the respondent beyond doubt that at the commencement of the voyage from Victoria the Indien was in all respects seaworthy and properly equipped and supplied at that time, or that due diligence was exercised to make her in all respects seaworthy and properly equipped and supplied, then libelant has no standing in this court and must be dismissed without relief in this cause. On the other hand, if respondent has failed to sustain its burden and remove any doubt as to whether at the commencement of the voyage from Victoria the Indien was in all respects seaworthy and properly equipped and supplied for the particular voyage, or if that cannot be established that it has failed to show beyond doubt that due diligence was used to make the ship in that condition, then it and the ship is liable for the damage that libelant has sustained by reason of the dislodged sounding pipe cap and other deficiencies of the vessel that will be mentioned later. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; The Southwark, 191 U. S. 1, 24 S. Ct. 1, 6, 48 L. Ed. 65; The Jeanie (C. C. A. 9) 236 F. 463; Com-

pagnie Maritime Francaise v. Meyer (C. C. A.) 248 F. 881; Kaufer Co. v. Luckenbach S. S. Co., Inc., (D. C. Wash.) 284 F. 160.

■ In The Southwark, supra, the Supreme Court said: "But whether fault can be affirmatively established in this respect, it is not necessary to determine. The burden was upon the owner to show, by making proper and reasonable tests, that the vessel was seaworthy and in a fit condition to receive and transport the cargo undertaken to be carried; and if, by the failure to adopt such tests and to furnish such proofs, the question of the ship's efficiency is left in doubt, that doubt must be resolved against the shipowner, and in favor of the shipper. In other words, the vessel owner has not sustained the burden cast upon him to establish the fact that he has used due diligence to furnish a seaworthy vessel, and, between him and the shipper, must bear the loss."

And in California & Hawaiian Sugar Refining Corp. v. Rideout (C. C. A.) 53 F.(2d) 322, 325, Judge Sawtelle, in considering the burden cast by the law upon the shipowner where he claims the ship to have been seaworthy at the commencement of the voyage and seeks to avail himself of the exemptions of the Harter Act, said: "It will thus be seen that the carrier has the burden of proof to establish due diligence before he can claim exemption from liability on the ground of danger of the sea, and the Harter Act [46 US CA §§ 190–195], is to be strictly construed against the carrier."

■ I have carefully read the nearly 900 pages of depositions, and I have examined all of the exhibits in this cause, and I have carefully studied the able briefs of respective proctors, and I now find myself in the position of doubt as to whether the Indien was properly dunnaged under the aft deckload of "Jap squares" so as to make her seaworthy, in other words so as to make her reasonably fit to make the specific voyage across the Pacific on the North Pacific route in February with the cargo that she had in her holds and between and upon her decks, and this doubt under the evidence also extends to the question as to whether due diligence was used to make the Indien seaworthy for the intended voyage. The court finding itself in this state of mind under the weight of authorities cannot exempt the ship or respondents from liability for the damaged cargo.

I shall not undertake to set out a detailed analysis of the record that leads me to the conclusion just stated. It is deemed sufficient to chronicle briefly reasons that have impelled this decision.

The deckload dunnage in question was made by laying fore and aft a single line of 1½x6" boards, 3 or 4 feet long around the outside edge of the flush deck, just inside of the deckload stanchion sockets. This placed the fore and aft dunnage in close proximity to the "scuppers" and sounding pipes and the particular sounding pipe in question, that were ranged fore and aft of the ship's deck. The space between the fore and aft dunnage pieces was 1 or 2 feet. Then athwartship dunnage consisting of 1x4" or 1x6" boards 12 to 16' long were placed with the outer ends resting on top of the fore and aft dunnage. On top of the dunnage thus arranged the deckload timbers or "Jap squares" were laid fore and aft, the outer edge of the outer tiers being approximately even with the outer edge of fore and aft dunnage. This method of dunnaging the deckload of heavy timbers was insecure and insufficient according to the evidence because the fore and aft line of dunnage, if used at all, should have been longer so as to prevent just what had occurred, to wit, the loosening and floating about of the fore and aft dunnage. As it was only 3 or 4 feet long, it was only held in place by one or two of the thwartship dunnage, which in turn might or might not be held down by the outside tier of the deckload of timber. It is significant that the experts called by respondents thought that there would be an advantage in using longer fore and aft pieces of dunnage, and the record shows that on a subsequent voyage where the dunnaging was supervised by some of these experts longer pieces of fore and aft dunnage were used. There was less likelihood of fouling the sounding pipe or of interfering with its cap if longer fore and aft dunnage had been used, or if indeed no fore and aft dunnage of any kind had been utilized, and while the record does not justify finding that fore and aft dunnage was improper per se, the respondent has failed to sustain its burden that having been used in the manner in which it was used on the Indien on this voyage due diligence was employed to make the Indien seaworthy in this respect.

■ The fore and aft dunnage that was used on the Indien under the deckload of timber was intended to compensate for the camber or convexity of the ship's deck from side to side so as to make an even base upon which to lay the deckload, but in using it, while the camber may have been provided for by the

manner in which this fore and aft dunnage was placed, it made no allowance for the sheer or concavity of the ship's deck from bow to stern which, according to the testimony, was of appreciable importance in arranging the dunnage for the deckload cargo. If the fore and aft dunnaging method were to be used at all, it appears to me from the better weight of the evidence that it would have been duly diligent and prudent to have used longer pieces and of varying thicknesses so as to provide for sheer and lay a level base. Deckload dunnage to be seaworthy should be laid so that the superimposed load will bear as evenly as practicable upon all the dunnage. This applies to thwartship as well as fore and aft dunnage, and it is clear from the fact that two pieces of dunnage became loose and were instrumental in causing the damage that the requirement of evenly secured dunnage was not observed in this instance, and in my judgment the failure to observe this requirement amounted to a lack of due diligence in making the Indien seaworthy for the intended voyage.

There is no satisfactory evidence that the seas that the Indien had encountered during the voyage were not to be expected on the North Pacific route at that time of the year. Mariners who had navigated there previously testified that many sea catastrophes had occurred there and that violent storms were to be anticipated. The damages cannot be attributed to dangers of the sea or to causes beyond the respondent's control.

In order for respondent to sustain the burden of proof that the cause of the dislodgment of the cap of the sounding pipe was one that exempts it from liability under the Harter Act (46 USCA §§ 190–195), it must not only nullify the ordinary effect of the ship's officers' opinion as expressed by them in the log, but it must also be permitted to impeach and discredit its own witness, the ship carpenter, who positively and unequivocably testified that he securely replaced the cap on the sounding pipe on the morning of February 8th. This a litigant should not be permitted to do merely to support a contention, and should be precluded from doing so in admiralty because of the strict adverse construction of the Harter Act that is imposed upon the carrier and ship owner.

The court is asked to disregard the sworn testimony of the member of the crew of the Indien whose special duty it was to attend to the sounding pipe at the time when the damage to it occurred, and is also asked to rule out the log entries made by the ship's officers at a time when there was no reason for them to draw wrong inferences and to record them in a most salutary instrument of nautical evidence, and in place of these forceful agencies of proof to base an inference upon a mere conjecture that it was physically impossible for the cap to have become loosened by the action of the dunnage, and that therefore the evidence which respondent offered to prove what was done aboard ship to tighten the cap is unworthy of belief. It is well settled in law, and I think that the rule should be applicable to admiralty, that an inference must be founded on a fact legally proved, and as the deduction that the carpenter failed to tighten the cap on the sounding pipe can arise only by disregarding sworn testimony that is not inherently improbable, or by permitting a party to vouch for a witness' credibility and then impeach him, the deduction that is advanced by respondent does not arise to the state of inference, but if adopted would be a mere guess at what happened, and if we consider the stresses and strains of the Indien in a sea such as she encountered and which she expected to meet on this voyage, the more reasonable and surely the better supported deduction by facts legally proved is that, considering the position and appearance of the stick of dunnage that was in proximity to the sound pipe and cap thereof, it is reasonably probable that the loosened dunnage was instrumental in causing or contributing to the damage to the cargo.

Proctor for respondent argues the impossibility of the loosened dunnage board being instrumental in unscrewing the cap because of the position of the dunnage stick when found being so placed that its motion against the cap would tend to screw it tighter rather than unscrew it. This argument is based upon the testimony of the chief officer as illustrated by a drawing made by him and marked Respondent's Exhibit A. It appears from the record, however, that when the matter was fresh in the mind of the chief officer and shortly after the voyage in question, he drew another sketch, that is introduced in evidence as Libelant's Exhibit 1, in which he pictorialized and placed the stick of dunnage that is supposed to have connected with the sounding pipe cap in a position where its action against the cap would have resulted in unscrewing it. I think that the more creditable explanation and delineation of this incident is that shown by Libelant's Exhibit 1.

Counsel for respondent cites The Newport News (D. C.) 199 F. 968, as analogous to the present inquiry and as decisive that the Indien was entirely seaworthy and not legally li-

able for the damaged cargo. I think there are so many potent dissimilarities between The Newport News and those shown by the record here that little aid is furnished by that case in the solution of our problem. It was clearly shown in The Newport News that the deck cargo of barreled resin was properly stowed, while here, according to our finding, no such condition has been sufficiently shown because of the faulty method of dunnaging. It was also shown that the displacement of the sounding pipe cap was not caused by the manner in which the deck cargo was stowed, while here the legal effect of all the evidence indicates the probability that the faulty dunnaging of the deckload contributed to, if it did not entirely cause, the dislodgment of the cap and consequent damaging of the cargo of ammophos. Here the cap projected out above the end of the pipe, which in turn was elevated some inches above the deck, and the annular circumference of the cap was roughened or notched, making an effective seat for the piece of loosened dunnage to impose force against the cap and tend to unscrew it, while in The Newport News the cap when in place was flush with the flange which was substantially the top of the sounding pipe and could not have been loosened or unscrewed by anything except intentionally or by the straining of the vessel. How the cap in this cause could have been loosened by the straining of the ship has not been shown, and probably could not be shown, and the deck cargo in this matter had little directly to do with the unscrewing of the cap, because throughout the entire voyage the deckload remained aboard. The weather encountered by The Newport News was so destructive that it caused the loss of one-fourth of the deckload of barrels of resin. Here no cargo whatever was lost overboard. I think these differences destroy the application of The Newport News as a decisive authority here.

■ There is considerable evidence in the record of this cause that justifies the doubt as to whether the seaworthiness of the Indien for the voyage in question was not impaired by overloading. The log entries of the fore and aft drafts and the builder's blueprint showing the loading scale of the Indien indicate clearly that she was overloaded by four and one-half inches from the winter Plimsoll mark on leaving for this perilous voyage across the Pacific. The effect of this showing is attempted to be offset by oral testimony of the chief officer as to actual observations of the Plimsoll mark at Nanoose and by computations for salt water buoyancy and additional load acquired at Victoria, and by evidence

that the Indien had a "Hog" that would account for the inaccurate draft readings. This contradictory evidence is not only subject to the infirmity of being acquired post litam motam, but it is rebutted by experts called by libelant, and in my judgment it is not strong enough to remove the doubt that is created by the log entries and measurements that the ship was overloaded when she left Victoria.

The Plimsoll mark is placed on the ship after careful and mathematical determination of her safe loading point, and it should be regarded in the admiralty courts as very strong evidence of the ship's capacity. Its efficacy in the ascertainment of whether a vessel has been properly loaded should not be destroyed except upon clear and convincing proof without doubt that it is erroneously placed or that the specific facts in the case undoubtedly warrant a finding that loading a vessel so as to submerge the Plimsoll mark did not render the vessel unseaworthy. Neither of these conditions are present in this cause.

There is one further observation to be noted on the sufficiency of the showing of due diligence by the respondent to make the Indien seaworthy at Victoria. There was no independent survey of the vessel at either Nanoose or Victoria. I think, in view of the danger signals that appeared from the draft readings and the consequent position of the Plimsoll mark, that prudence and foresight should have prompted the obtaining of a competent, impartial, and disinterested opinion of a marine surveyor before commencing this voyage on a course that was new to the navigator of the vessel.

■ I approach the ultimate question in this proceeding, which is: Assuming that unseaworthiness has been sufficiently shown and that due diligence to make the ship and her equipment seaworthy has not been sufficiently proved, is it necessary for libelant to go further and prove that the damage to the ammophos was proximately caused by the unseaworthiness? I think not, especially as to the unseaworthiness because of overloading. The overloading of a ship is so fraught with danger that whenever it is satisfactorily shown, all the loss or injury that is sustained on the voyage of the overloaded ship should be imposed upon the vessel and the carrier and should not fall upon those who have shipped property or merchandise under the absolute obligation of the carrier to furnish a seaworthy vessel that is fit for the cargo to be carried at the commencement of the voyage.

We find lack of harmony on this question in two Circuit Courts of Appeals that have had occasion to consider it, and neither the Supreme Court nor the Ninth Circuit Court of Appeals, has directly passed upon the question as far as I have been able to ascertain.

In the Willdomino (C. C. A. 3) 300 F. 5, 1924 A. M. C. 889, it was held that the carrier was liable when it failed to sustain the burden of proving the seaworthiness of the ship or in exercising due diligence to make her so regardless of whether there was any causal connection between the lack of seaworthiness or due diligence and the loss. While in The Spartan (C. C. A. 2) 47 F.(2d) 189, 1931 A. M. C. 1, and in (May v. Hamburg, etc.) The Isis (C. C. A.) 63 F.(2d) 248, 1933 A. M. C. 390, 396, the contrary doctrine was announced. It is to be noted that the Willdomino, supra, was affirmed by the Supreme Court, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491. However, the Supreme Court did not pass upon the question of the necessity of showing a causal connection between the unseaworthiness and the loss.

In addition to the damage to the shipment of ammophos done by the water entering the hold in which it was stowed, there was further damage done to the cargo of fertilizer by the breaking of another pipe leading to the fuel tank. This damage was due to oil soaking the fertilizer and was not discovered until the vessel was discharging cargo in a Japanese port. There is no positive evidence as to the condition of this pipe at the commencement of the voyage at Victoria, and the only inspection that was made of it there was to knock on it with a hammer above the place where it leaked and at a point where visual observation of the region of the defective part of the pipe was not made on account of the flooring through which the pipe led to a fuel tank. This board floor had not been removed to properly examine the pipe since September 15, 1928, about four and one-half months prior to the departure from Victoria. This in my opinion was not sufficient inspection to amount to due diligence. Moreover, if the court is correct in its conclusion as to the effect of unseaworthiness of the vessel on account of overloading, the damage caused by the oil should fall upon the respondent as well as the other damage occasioned by the water.

To summarize, I find that respondent and claimant have not met their required burden of proving beyond doubt that the Indien was in all respects seaworthy, or that due diligence was used to make her so for the voyage from Victoria, and I further find that the damage to the cargo of ammophos has not been proved beyond doubt to have arisen from causes that exempt the respondent or claimant from liability.

It follows that findings and decree are ordered for libelant in accordance herewith and for costs and the cause is now referred to United States Commissioner Head to assess the damages and report his findings to the court for further consideration.