**HOCKLEY et al. v. EASTERN TRANSP. CO.**

No. 2039.

District Court, D. Maryland.
March 25, 1935.

George W. P. Whip (of Lord & Whip), of Baltimore, Md., for libelants.

John T. Tucker (of Keech, Carman, Tucker & Anderson) and Clarence Tucker (of Knapp & Tucker), both of Baltimore, Md., for respondent.

CHESNUT, District Judge.

This case now stands for disposition on the merits after hearing testimony and arguments of counsel. The general nature of the case was outlined in a former opinion ([D. C.] 9 F. Supp. 411) covering a point arising on the pleadings, relating to what vessels must be surrendered by the respondent as a condition of exercising the claimed right of limitation of liability, for the loss of a cargo of acid phosphate when the respondent's chartered barge, the "Calvin" sank in the Patuxent River on January 29, 1934, while on a voyage from Baltimore, Maryland, to Norfolk, Virginia.

The charter party in conventional form was entered into on January 25, 1934 between the Receivers of the Davison Chemical Company as charterers, and the Eastern Transportation Company as owner of the barge "Calvin," and provided for transportation of cargo of acid phosphate from Baltimore to Norfolk, the freight to be computed on the basis of 60 cents per ton of 2,240 pounds. The motive power for the towing of the barge was not specified, but it is agreed that in charter parties of this character it is implied that the barge owner will furnish suitable motive power. The charter party expressly reserved to the barge owner the benefits of the Harter Act (USCA, title 46, § 192). It also contained the following stipulation regarding seaworthiness:

"The Owner shall exercise due diligence to make the Tug and/or Barge tight, staunch, strong and seaworthy and the Owner of the Tug and/or Barge shall not be liable for any loss or damage to cargo occasioned by any defects whatsoever in hull, machinery and/or equipment of the Tug and/or Barge whether such defects existed before the commencement or arose during the voyage, provided all reasonable means had been taken to make the Tug and/or Barge seaworthy."

The questions in the case are (1) whether the Eastern Transportation Company, the barge owner, is liable for the loss of the cargo caused by the sinking of the barge; and (2) if so, is it entitled to limit its liability in accordance with USCA title 46, § 183. The contention of the libellant is that when the vessel broke ground, that is, at the start of the voyage after the loading, the barge was not seaworthy; and further, that the Transportation Company did not exercise due diligence to make the barge seaworthy for the voyage; and that therefore the Transportation Company is liable for the loss; and is not permitted to limit its liability under section 183 of title 46 because the charter party was the *personal* contract of the Transportation Company, signed by its secretary, A. H. Ollwine.

I will first consider the question of the liability of the Transportation Company. Certain facts of the case are not in dispute. The barge was loaded at the plant of the Davison Chemical Company at Curtis Bay, on January 25, 1934. The loading was done

under the supervision and direction of the barge captain, an employe of the Transportation Company. A bill of lading was issued by him showing that the load consisted of 1,947,940 pounds, that is, about 974 tons of 2,000 pounds or about 869 tons of 2,240 pounds. The bill of lading also stipulated that the barge owner should have the benefit of the Harter Act. After the loading was completed to the satisfaction of the barge captain, she was taken in tow by a tug of the Transportation Company on January 26 and towed to another point in the harbor where the tug picked up another barge, and then proceeded to Sparrows Point where two more barges were included in the whole flotilla and, on January 27 and 28, the barges were towed down the Chesapeake Bay on their way to Norfolk. In the afternoon of January 28 when off the Patuxent River the master of the tug became satisfied from the weather conditions that a storm was imminent and as a precautionary measure he towed the barges into the Patuxent River and had them anchored on the usual anchorage grounds. The hour was about 7.30 P. M. Three of the barges, the Celestine McNally, the Calvin and the Virginia, all belonging to the Transportation Company, were anchored together and made fast one to another by the usual lines, the Calvin being placed between the two other barges, and separated from them by only a few feet. The tug then proceeded up the River to a wharf at Solomon's a mile or more away and out of sight of the barges. The master of the tug seemed to feel no further responsibility for the barges after anchoring them on the usual grounds. The weather and water remained relatively calm for several hours, but about midnight the wind began to blow hard and a few hours later and before the sinking of the Calvin, had attained an estimated velocity of 40 miles an hour and was referred to by the witnesses as a gale. The barges were of about the same size and construction. The Calvin was 187 feet long with a beam of about 24 feet. The McNally was little larger and the Virginia a little smaller. All three were loaded with cargo but the Calvin was loaded comparatively more heavily than either of the other barges and was lower in the water than they were. About 3 A. M. on January 29, the Calvin began to go down by the starboard stem, having evidently sprung a leak, and the water apparently came in so fast that the power engine situated aft was not able to exhaust the intake of water forward, and the weath-

er conditions were such, according to the barge captain, that he was unable to work the forward hand pumps. About 3:30 he put up a red light which I find was intended to be a signal to the tug for assistance. The tug, however, was not within sight of the barges and gave no assistance, the master of the tug stating as a witness that under the circumstances although aware of the rising storm, he did not feel called upon to do anything to look out for the safety of the barges and furthermore he said he could not reasonably have gotten his tug away from the wharf by reason of being blocked by other vessels. Compare Md. Transp. Co. v. Dempsey, 279 F. 94 (C. C. A. 4). The crews on the three barges were apparently unable to do anything to stop the sinking of the Calvin which occurred at about 5 A. M. in about 40 feet of water whereby she became an actual total loss of barge and cargo. The tug did not return to the barges until about 9:45 A. M., and after they had drifted half a mile or more from their original anchorage. The particular tug, after reporting the loss of the Calvin by telephone to Baltimore, was assigned to other duty and subsequently the remaining barges in the flotilla were towed to Norfolk by another tug belonging to the Transportation Company.

The testimony as to the seaworthiness of the Calvin, both of eye witnesses and experts, was conflicting. It is not disputed that she was an old wooden barge, about 26 years old. In August 1933 she was hauled out of the water at Norfolk and repairs at a cost of about $200 were made to her hull. Extensive repairs had been made to her about a year before in Baltimore. In December 1933 she had reported certain damage to a cargo she was carrying, while at Alexandria, Virginia. This damage was apparently caused by improper stowing or loading in the aftermost hold whereby water in the bilge ran up over the skin of the barge and damaged the cargo there stowed. She was not hauled out of the water for inspection after this incident, and it is contended by the libellant that such an inspection should have been made, to see if any of her under water planks had been strained or other damage done. She was also given some further repairs, including new pumps, but not under water inspection, prior to the loss. There was some testimony that while she was being loaded her engines were running for a considerable time, indicating, as the libellant contends,

that she was then leaking more than normally. This testimony is of some weight in the problem of determining her seaworthiness but of itself is, I think, not sufficient to show that she was unseaworthy or that due diligence was not exercised by her owners to make her seaworthy. The more important contention of the libellant is that her unseaworthiness resulted from her being *overloaded*. If she was in fact overloaded it was the fault of her captain because the loading of the barge was entirely under his orders and at his discretion as to the amount. He was a man of several years' experience in handling of barges but had been on this particular barge only a few months. He had taken another cargo of acid phosphate from the Davison Chemical Company only a short time before, on January 12, 1934, but the load that he then took was only 923 short tons of acid phosphate. That particular voyage was apparently without incident. On January 25 when the loading of the barge had proceeded to such an extent that the next car load of phosphate about to be loaded would have made a total load exceeding 923 tons, which was the amount taken on the former voyage, an employe of the Chemical Company called the barge captain's attention to that fact and was told nevertheless to load the contents of the additional car because, as the captain said, he was going to take more this voyage than on the last. The result was that 974 tons were loaded, about 50 tons more than on the former voyage. It is not entirely without significance in this connection that the freight to be earned by the barge was on the basis of 60 cents per ton without limitation as to the amount to be carried.

In considering whether the barge was overloaded, we have the fact that the other barges with which she was closely connected on the voyage and during her anchorage in the Patuxent River were of the same general character as the barge which sank and were subjected to the same weather conditions but were relatively more lightly loaded. There is no testimony to show that the Calvin was subjected to any particular strain or stress or perils of the sea not encountered by the other barges. And yet she sank and they did not. It is natural to look for some adequate cause for her casualty when they rode the storm in safety. The storm itself, while severe, was not unprecedented and not unusual for winter weather on or near the Chesapeake Bay.

As the barge was quite old and necessarily had to be repaired from time to time more frequently than a comparatively new barge, it would not be unreasonable to find that an excessive loading would in a heavy sea subject her to greater strains and stress and thus possibly cause an opening of her forward planks. If we assume that the circumstances do not warrant the presumption of unseaworthiness merely from the sinking, nevertheless unseaworthiness resulting from overloading would be a not improbable cause. But whether in fact there was unseaworthiness because of overloading must be determined from the weight of the testimony which is conflicting.

As a practical matter in loading the barge the captain goes by the freeboard which he thinks is sufficient for the barge's safety. The freeboard is, of course, the distance between the deck line and the water line. The barge captain of the Calvin testified that he regarded 24 inches of freeboard as reasonably safe and in this he is confirmed by the Transportation Company's expert marine surveyor who, however, admitted that if the freeboard was in fact, when the boat was loaded, materially less than two feet, as for instance a foot, then the barge was dangerously overloaded. Other experts testifying for the libellant stated the view that safety for this barge would require a freeboard of 28 or 30 inches or more.

The respondent's witness, a Mr. Stein, a marine engineer and surveyor with long practical experience, made the theoretical calculation that the barge when loaded should have had a freeboard of approximately 27 or 28 inches and in his opinion should safely have carried a cargo load of 900 tons of 2,240 pounds each, which he thought would still have left her a freeboard of about 24 inches. His calculation to determine her theoretical freeboard with the actual load was based on the given draft fore and aft, with allowance for certain other dimensions of the barge, some stated and some assumed. On the other hand, the libellant's most qualified expert, a Mr. Chapman, a naval architect and consulting engineer of long experience, likewise took the same recorded draft and dimensional factors of the barge, and calculated that the theoretical freeboard of the barge when loaded was only 17 inches and in his opinion the barge could not safely have carried a load of more than 847½ tons of 2,000 pounds each and was, therefore, accord-

ing to his theory, in fact overloaded. In his opinion safety would have required that the barge have at least 28 inches of freeboard. The principal difference between the two calculations is that Stein calculated the freeboard exactly amidships while Chapman determined it at the lowest point which was considerably aft of amidships; and Stein made no allowance for the camber or slope of the deck from the middle to the sides, for which Chapman allowed 6 inches. Both used 11 feet as the depth of the hold and Stein claimed it unnecessary to allow for camber because he contended that the depth was measured from the side and not from the center of the deck. Other data in the case does not clearly enable me to determine which of the witnesses is correct on the allowance for camber but Chapman's measurement of the freeboard from the lowest point on the deck rather than amidships would seem to be correct. The testimony of other experts, perhaps less qualified in theory, was to the general effect that in their opinion from the data given them the barge was overloaded. The registered net tonnage of the boat was given as 415 tons. This is determined from available cubic feet for cargo, 100 cubic feet being reckoned as a ton. Some of the experts disagreed as to whether the tonnage for a safe load should be reckoned on the basis of long tons or short tons, which of course would make a material difference in the actual cargo capacity by weight. They also disagreed as to whether in actual loading the factor of safety is two or two and one-half times the registered net tonnage. Taking the actual load of 1,947,940 pounds, it is obvious that if the libellant's experts were right in their claims, then the barge was clearly overloaded, theoretically at least; while if the respondent's expert is correct in his assumption the barge was theoretically, not overloaded. As to ships, if not barges, the respondent's expert seemed to be sustained by a marine hand-book on the point as to whether the actual load should be calculated in long tons rather than short tons with reference to net tonnage capacity. But on the whole it is my judgment that the weight of the expert testimony favors the libellant's contention that the barge was overloaded. There is, however, one point on which the experts were agreed, that is, the barge when loaded should have had an actual freeboard of at least about 24 inches and if it was materially less, as for instance only 12 inches, then it was dangerously overloaded.

With these irreconcilable differences on theoretical considerations in the testimony of the experts, I find in this particular case more reliance to be placed on the testimony of eye witnesses as to what was the actual freeboard of this barge when loaded on this voyage. And here the testimony, while somewhat conflicting, is, I think, very reasonably satisfactory and the weight of it is very decidedly in favor of the libellant's contention that as a matter of fact the actual freeboard was not more than about 12 inches at the outside, and therefore, according to the view of the respondent's own expert witness, the barge was dangerously overloaded. Each of the three barge captains testified, two for the respondent and one for the libellant. The captain of the Calvin said that he had about 24 inches freeboard; the captain of the McNally said that his barge had about 6 or 8 inches more freeboard than that of the Calvin; and the captain of the Virginia (the quality of whose testimony seemed much more impressive to me than that of the others) testified that the Calvin had freeboard of less than 12 inches. Three witnesses at the plant of the Chemical Company also testified that the Calvin when loaded had less than 12 inches of freeboard. The basis of the estimates of each of these witnesses was not merely an eye measurement of distance but was the number of side planks visible above the water line. The width of a side plank is about 8 inches and the testimony of the witnesses for the libellant was in substance that the freeboard consisted only of one plank and about 2 inches of the second plank out of the water amidships. The decided weight of the testimony is, therefore, favorable to the libellant on this controverted issue.

We have, therefore, the established facts (1) that the barge was 26 years old; (2) that it had needed and apparently had received repairs on several occasions in the two years preceding its loss; (3) that on its last voyage it carried a cargo of 50 tons in excess of the last prior voyage; (4) that with its last load it had a freeboard of not more than 12 inches (which constituted dangerous overloading); (5) that it encountered and sustained the same weather conditions as the other barges; (6) that it sank while they survived; (7) that the storm while severe was not extraordinary for the winter season; (8) that the excessive loading of a barge this old can very naturally be expected to strain her planks and open her seams in severe weather.

With these facts established I reach the conclusion as a matter of fact that for this particular barge at this particular time of the year the excessive loading rendered her unseaworthy when she broke ground on the voyage and that her unseaworthy condition caused her loss. The Benjamin Noble (D. C.) 232 F. 382; Id., 244 F. 95, 97 (C. C. A. 6); Capitol Transp. Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631; The Charles Rohde, 8 F.(2d) 506 (D. C. Md.); The Indien (D. C.) 5 F. Supp. 349, 355; Id. (C. C. A.) 71 F.(2d) 752; The Franz (D. C.) 2 F. Supp. 497, 499; Id. (C. C. A.) 67 F.(2d) 995; May v. Hamburg, 290 U. S. 333, 353, 54 S. Ct. 162, 78 L. Ed. 348; Schnell v. The Vallescura, 293 U. S. 296, 55 S. Ct. 194, 79 L. Ed. —, Dec. 3, 1934.

■■ With regard to whether due diligence was observed to make her seaworthy as required by the Harter Act and also by the special provisions of the charter party and bill of lading, I reach the conclusion that the required diligence was not observed. From the respondent's testimony, the amount of the load and the general conditions of loading were left entirely to the barge captain without general or specific instructions from the Transportation Company. His own testimony was in effect that the barge ought to have had a freeboard of about 24 inches and the testimony of the respondent's expert was to the same effect. In fact she was loaded so that she had a freeboard of not more than 12 inches. The barge captain must be held to have known that this was excessive loading. Where diligence is required of the owner to make the vessel seaworthy, the duty may not be validly discharged merely by engaging a competent captain, and entrusting the duty to him. The duty is nondelegable, and the failure will be attributable to the owner. And overloading the ship makes her unseaworthy. Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631; Oxford Paper Co. v. Nidarholm, 282 U. S. 681, 684, 51 S. Ct. 266, 75 L. Ed. 614; The Harper No. 145, 42 F.(2d) 161 (C. C. A. 2); The Vestris, 60 F.(2d) 273, 278 (D. C. N. Y.); The Giles Loring, 48 F. 463 (D. C. Me.); The Whitlieburn, 89 F. 526 (D. C. S. D. N. Y.); The Dana, 190 F. 650 (D. C. E. D. N. Y.); Steamship Wellesley & Co. v. Hooper, 185 F. 733 (C. C. A. 9); Sumner v. Caswell, 20 F. 249 (D. C. S. D. N. Y.). Under the provisions of the Harter Act (46 USCA §§ 190–195)

where exemption from liability is given for faults of navigation if due diligence has been observed to make the vessel seaworthy, overloading of the vessel by the captain constitutes such absence of due diligence and makes the owner liable even though not personally at fault. International Navigation Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830; Earle & Stoddart v. Ellerman's Wilson Line, 287 U. S. 420, 53 S. Ct. 200, 77 L. Ed. 403; May v. Hamburg, etc., 290 U. S. 333, 54 S. Ct. 162, 78 L. Ed. 348; Bethlehem Shipbuilding Corp., Ltd., v. Jos. Gutradt Co. et al., 10 F.(2d) 769 (C. C. A. 9); The Point Brava, 1 F. Supp. 366 (D. C. N. D. Calif.). See particularly the excellent review of the history of the applicable law in the opinion of Judge Brawley for the Circuit Court of Appeals for this Circuit in Nord-Deutscher Lloyd v. Insurance Company of North America, 110 F. 420, in a factual situation somewhat similar to this case. And the same rule would seem to be equally applicable under the special provision in the charter party which is similar in effect to the requirements of the Harter Act. I do not understand that this proposition of law is disputed by the respondent. I must, therefore, conclude as a matter of law that the respondent is liable for the loss.

■ The libellant also contends that the respondent is absolutely liable as an insurer because the chartered barge *deviated* from the agreed upon voyage. Reference here is made to the facts already stated that the barge Calvin was not towed directly and immediately on her voyage from Baltimore to Norfolk but on being taken in tow by the respondent's tug Hilton, the latter proceeded to another point in the harbor and picked up another loaded barge and then again broke the journey at Sparrows Point and picked up two additional barges, so that instead of towing the barge Calvin only, the tug was towing a flotilla of four barges, and two days' delay was thereby occasioned. The terms of the charter party are also pointed to to show that no mention was made of towing the Calvin in a flotilla, from which it is argued that a single and not multiple tow was necessarily contemplated. The Hermosa, 57 F.(2d) 20 (C. C. A. 9); The Indrapura, 171 F. 929 (D. C. Ore.); The Willdomino, 272 U. S. 718, 47 S. Ct. 261, 71 L. Ed. 491. But this contention, in my opinion, must fail because the respondent has definitely shown by uncontradicted testimony that under contracts of carriage

such as here existed it is the general custom of the port to permit a multiple tow unless a single tow is expressly agreed upon. Hostetter v. Park, 137 U. S. 30, 11 S. Ct. 1, 34 L. Ed. 568.

The remaining question in the case is whether the respondent is entitled to limit its liability in accordance with USCA, title 46, § 183, the well known limitation of liability statute enacted in 1851 and for years constituting Rev. St. § 4283. This statutory provision reads as follows:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, or any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred without the privity, or knowledge of such owner or owners, shall in no case exceed the amount of value of the interest of such owner in such vessel, and her freight then pending."

And closely related thereto should be also considered section 189 of title 46 USCA, which was first enacted June 26, 1884, c. 121, § 18, 23 Stat. 57, reading as follows:

"The individual liability of a shipowner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessels and freight pending: Provided, That this provision shall not prevent any claimant from joining all the owners in one action; nor shall the same apply to wages due to persons employed by said shipowners."

■ In this case the libellant contends that these statutes are not available to the respondent because the contract of carriage was contained in a charter party which constituted the *personal contract* of the respondent, it having been signed by its secretary and it being a corporation, and the testimony showing that the secretary was one of the chief managing officers of the corporation. I have not found any adjudication in this district or in the Circuit Court of Appeals of this Circuit in which this point has been discussed at length, although it was noticed in The Nettie Moore, 270 F. 1005, 1007 (D. C. Md.), and in Pocomoke Guano Co. v. Eastern Transp. Co., 285 F. 7, 9, (C. C. A. 4); but it has been definitely established in several comparatively recent decisions of the Supreme Court that the statute is not available to a shipowner to limit his liability for consequences of the breach of certain personally made contracts. The reason given for the rule arises from the historical consideration that the statutes were enacted to harmonize the admiralty law of this country with that which had long prevailed in continental Europe and the purposes of the Acts were to protect the shipowner, not from the consequences of his own act or neglects (that is those done with his privity or knowledge) or of his own contracts, but from the consequences of the acts, contractual or tortious, of the master, crew, or agent regarding the vessel *when not under the control or supervision of the owner.* The Fred E. Hasler, 65 F.(2d) 589; 590 (C. C. A. 2); Richardson v. Harmon, 222 U. S. 96, 32 S. Ct. 27, 56 L. Ed. 110; Benner Line v. Pendleton (C. C. A.) 217 F. 497, 507, affirmed 246 U. S. 353, 356, 38 S. Ct. 330, 62 L. Ed. 770; The Julia Luckenbach (C. C. A.) 235 F. 393, 397; Luckenbach v. W. J. McCahan Sugar Co., 248 U. S. 139, 149, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; Cullen Fuel Co., Inc., v. W. E. Hedger, Inc., 290 U. S. 82, 88, 54 S. Ct. 10, 78 L. Ed. 189; Great Lakes Towing Co. v. Mill Transp. Co., 155 F. 11, 22 L. R. A. (N. S.) 769 (C. C. A. 6), certiorari denied 207 U. S. 596, 28 S. Ct. 262, 52 L. Ed. 357; The Loyal (C. C. A.) 204 F. 930; The Benjamin Noble (D. C.) 232 F. 283, Id. (C. C. A.) 244 F. 95, affirmed under the name Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631. In most of these cases the liability which was not permitted to be limited arose from a breach of an express warranty of seaworthiness. Prior to Cullen Fuel Co., Inc., v. W. E. Hedger, Inc., 290 U. S. 82, 54 S. Ct. 10, 78 L. Ed. 189, there had been conflicting views in different circuits as to whether the rule applied to the case of an implied warranty as well as to one that was express (see Pocomoke Guano Co. v. Eastern Transp. Co., 285 F. 7 (C. C. A. 4); but in the Cullen Case it was finally settled that the same rule applied in both situations.

■ It is contended here by the respondent that the rule can have no application because there was no warranty of seaworthiness in the contract and it is argued that the rule applies only where there is one. But it will be found that the rule has been applied to breaches of personal contracts which relate to other matters than sea-

worthiness. See for instance, Great Lakes Towing Co. v. Mill Transp. Co. (C. C. A.) 115 F. 11, 22 L. R. A. (N. S.) 769; The Nat Sutton (C. C. A.) 62 F.(2d) 787, 789, 790; Id., 63 F.(2d) 1021 (C. C. A. 2). I fail to find in the statement of the principle in the cases cited any limitation thereof to warranties for seaworthiness. And the reason for the rule would seem to afford no opportunity for so limiting it. Of course the consequences of a breach of contract depend upon the nature of the promise that is broken. If it is a warranty, there is no necessity to show causal relation between the breach and the loss; and this is now established as true with respect to the shipowner's obligation to use due diligence (not a warranty) to make the vessel seaworthy, as a condition of exemption from liability for loss occasioned by faults of navigation or management by agents, under the Harter Act. May v. Hamburg, 290 U. S. 333, 350, 54 S. Ct. 162, 78 L. Ed. 348, disapproving The Turret Crown, 284 F. 439, 444, 445 (C. C. A. 4). In this case this point is perhaps not important as the basis of liability is rather the failure to use due diligence to make the barge seaworthy, than fault in navigation or management.

■ Again it is contended for the respondent that even though the contract is a personal one nevertheless the limited liability statute is available to the vessel owner, unless the breach of his contract is with his "privity or knowledge." This was indeed the separately expressed minority view of Circuit Judge Ward in The Loyal (C. C. A.) 204 F. 930, 932, 933, but the majority opinion written by Circuit Judge Noyes and concurred in, with some hesitation, by Circuit Judge LaCombe, took the contrary view, saying:

"The liability which the owner assumed was a liability springing from its own stipulation and not at all one imputed to it by responsibility for the acts of others. It was a contract from which the owner could not obtain immunity by the limitation statute, and this whether the breach of the contract was caused by the owner's acts or those of its agents. We are unable to accept the contention that a vessel-owner may be relieved from responsibility upon his personal contracts provided he does not break them himself. The making of the contract is enough to place it outside the statute."

The objection that the rule so announced would make the statute inapplicable to very many contracts of carriage of goods or passengers made by steamship companies was expressly adverted to by Judge Ward but did not prevail with the majority of the court. And the subsequent citation of the case with approval by the Supreme Court would seem to impliedly settle the controversy. Pendleton v. Benner Line, 246 U. S. 353, 356, 38 S. Ct. 330, 62 L. Ed. 770. It is true that in some of the cases where the limitation was denied the contract was not only personal but the breach thereof also with the privity or knowledge of the vessel owner, but in other cases there was either absence of privity or knowledge of the owner or it is not mentioned as a necessary condition for the application of the rule. It is not meant to imply that *all promises* in personal contracts are removed from the shelter of the limited liability statute, but chiefly those that pertain to conditions prevailing at the start of the voyage, notably seaworthiness. "The fitness of the ship at the moment of breaking ground is the matter warranted, and not her suitability under conditions thereafter arising, which are beyond the owner's control." Cullen Fuel Co., Inc., v. Hedger, Inc., 290 U. S. 83, 89, 54 S. Ct. 10, 11, 78 L. Ed. 189. See The Soerstad, 257 F. 130 (D. C. S. D. N. Y.—Judge Learned Hand); and The No. 34, 25 F.(2d) 602, 607 (C. C. A. 2—Judge Augustus N. Hand), where it was said:

"It would seem that 'personal contracts' have thus far been limited to those of the nature of warranties where the obligation was to be performed by the obligor personally and that they have not been extended to promises to do acts necessarily performed through the intervention of others. The Ice King (C. C. A.) 261 F. 897."

■ Looking at the reason for the rule, it seems that, with regard to matters of fitting the ship for the voyage in the home port (where the personal contract is made as in this case) the vessel owner has actual personal control or opportunities therefor, and may not delegate to agents the duties he owes to the shipper by personal contract, while with respect to matters happening after the voyage is begun, it is necessarily contemplated by both parties that these must be performed by agents of the owner, beyond his personal control. The dividing line, therefore, between what losses may be limited and what may not will ordinarily be marked by the time of breaking ground on the voyage. In the instant case the personal contract of the vessel owner required it to

use diligence to make the barge seaworthy for the voyage to be begun from its home port, where it had opportunities for personal control. There would seem to be no reason to permit limitation of liability in such a case, when it is denied in the similar case of an implied warranty of seaworthiness. There is nothing in the particular nature of a warranty which makes any essential difference in this legal situation, when considered in the light of the reason for the rule as to personal contracts of the vessel owner.

In the Malcolm Baxter, 277 U. S. 323, 331, 48 S. Ct. 516, 517, 72 L. Ed. 901, Mr. Justice Stone said:

"Both courts below agreed that the Baxter was unseaworthy on sailing, and that respondent failed to exercise due diligence to ascertain her condition before sailing. This was sufficient ground for denying the petition for exoneration and limitation of liability under the Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [46 USCA §§ 190–195; Comp. St. §§ 8029–8033, 8035]), and acts permitting limitation of liability to the vessel and pending freight (R. S. §§ 4282–4289 [46 USCA §§ 175, 182–188; Comp. St. §§ 8020–8027])."

. This was said without reference to the doctrine of personal contracts but would seem to at least imply that where the duty of due diligence to make the ship seaworthy is imposed by personal contract, limitation of liability may not be permitted. The distinction contended for by the respondent here is that, to deny the application of the statute, the failure of the vessel owner to exercise due diligence must be personal to him and not arise solely from the fault of a subordinate agent such as the master of the ship, without the owner's privity or knowledge. Craig v. Continental Insurance Co., 141 U. S. 638, 12 S. Ct. 97, 35 L. Ed. 886; LaBourgogne (Deslions v. La Compagnie Generale Transatlantique), 210 U. S. 95, 28 S. Ct. 664, 52 L. Ed. 973; The Galileo, 54 F.(2d) 913, 915 (C. C. A. 2), affirmed Earle & Stoddart v. Ellerman's Wilson Line, 287 U. S. 420, 53 S. Ct. 200, 77 L. Ed. 403. It is admitted that the duty of due diligence required of the shipowner as a condition of exemption from liability by the Harter Act is not delegable; but it is nevertheless contended that this duty imposed by personal contract may be delegated and though not performed by an agent, it will not make the limited liability statute unavailable to the vessel owner. And it is

said that the Supreme Court cases applying the rule of personal contract to warranties, express or implied, are not necessarily adverse to this distinction because a warranty is an absolute personal guarantee, failure to comply with which cannot be excused on the ground of faults of an agent. In support of the distinction advanced principal reliance is placed upon Earle & Stoddart v. Ellerman's Wilson Line, 287 U. S. 420, 53 S. Ct. 200, 77 L. Ed. 403. But the case is, I think, clearly distinguishable. There the court was dealing with the fire statute which affords complete immunity to any liability "unless such fire is caused by the design or neglect of such owner." USCA, title 46, § 182 (Rev. St. § 4282; Act March 3, 1851, c. 43, § 1, 9 Stat. 635). While a part of the limited liability statute of 1851, it is not the particular section thereof which limits the amount of liability, the latter being section 183 of title 46 USCA (Rev. St. § 4283). The court was not dealing there with the limitation of liability section nor was there found to be a personal contract of the kind herein referred to. It was pointed out that the phrase "design or neglect" as used in the fire statute was different from the requirement of "due diligence" in the Harter Act. It was held that the negligence of the engineer of the ship before sailing, not known to the owner, from which the fire resulted, did not constitute the "design or neglect" of the vessel owner as this phrase had been long previously construed to mean the personal negligence of the owner, and that the negligence of the master, chief engineer or other ship's officers did not deprive the owner of the statutory immunity. Reference is also made to the same case in the Circuit Court of Appeals for the Second Circuit, The Galileo, 54 F.(2d) 913, 915, where it was said:

"Unseaworthiness of a vessel has nothing to do with limitation of liability by the owner unless it exists with the owner's privity or knowledge. Lack of diligence to make the vessel seaworthy is therefore immaterial unless it is within the owner's privity of knowledge. Unless this be borne in mind, the use of the phrase 'lack of diligence to make seaworthy,' which under the Harter Act (46 USCA §§ 190–195) is not limited to the owner's personal failure and diligence, may well lead to confusion when applied to the limitation act."

But this was obviously said without reference to the doctrine of the owner's personal contract. The ordinary rule of con-

tract law is that one may not escape responsibility for his contracts through negligent performance by agents; and there seems to be no valid reason for creating the exception contended for in this case, which is not necessary to give all the scope to the statute which was intended in its enactment.

 Even if the limited liability statute should be held available to the respondent despite its personal contract, nevertheless, in my opinion, it is not entitled to the benefit thereof under the facts of this case which justify a finding of unseaworthiness of the barge with the privity or knowledge of its owner. It may be assumed that mere neglect of the vessel owner is not sufficient to establish its privity or knowledge. In The Virginia, 264 F. 986, 996 (D. C. Md.) affirmed sub nom. Hines v. Butler (C. C. A.) 278 F. 877, Judge Rose said:

"In LaBourgogne (Deslions v. La Compagnie Generale Transatlantique), 210 U. S. [95], 122, 28 S. Ct. [664], 673, 52 L. Ed. 973, the Supreme Court said that 'mere negligence, pure and simple, in and of itself, does not necessarily establish the existence on the part of the owner of a vessel of privity and knowledge within the meaning of the statute.' The language was carefully guarded. In the much later case of Richardson v. Harmon, 222 U. S. [96], 100, 32 S. Ct. 27, 56 L. Ed. 110, the court stated that section 4282 leaves an owner 'liable for his own fault, *neglect,* and contracts.' The italics are mine. In Pendleton v. Benner Line, 246 U. S. [353], 357, 38 S. Ct. 330, 62 L. Ed. 770, the court said it was not disposed to disturb that very strong and deliberate intimation. In Capitol Transportation Co. v. Cambria Steel Co., 249 U. S. 334, 39 S. Ct. 292, 63 L. Ed. 631, the court approved and applied its later decisions, but declared that it very much appreciated 'the danger that the act should be cut down from its intended effect by too easy a finding of privity or knowledge on the part of owners,' and added, 'We are not disposed to press the law in those directions further than the cases go.' The determination in other respects to give the statute a liberal construction for the benefit of owners is shown in the latest decision. Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal, 251 U. S. 48, 40 S. Ct. 66, 64 L. Ed. 130."

And under the decisions the mere knowledge of the barge captain as to the overloading, by reason of his comparatively subordinate employment, would not constitute privity and knowledge of the owner. But in this case we have other facts which seem to me important. While the loading of the barge was not under the direct personal supervision of the managing officers of the corporate owner, there were facilities for such supervision. The barge was loaded at the wharf of the libellant at Curtis Bay where there could readily have been telephonic communication between the barge captain and the Baltimore office of the respondent. The charter party was executed and the barge delivered on the same day at the libellant's plant. The loading occupied most of the day and the barge did not leave the wharf until midday the following day. The captain testified that when loaded he took the figures of the draft of the vessel and mailed them to the office of the Company before the voyage began. And thereafter the barge did not leave the harbor for at least another day and stopped at Sparrows Point, only a few miles from Baltimore, to pick up other barges where she was doubtless within reach by the executive officers after they had presumably received the notice of her draft. The freight to be earned was dependent on the tonnage loaded and the barge captain deliberately took 50 tons more on the particular voyage than on the last prior one. It is true the testimony of Mr. Ollwine for the respondent was in effect that the matter of loading was left entirely to the judgment of the captain, but under circumstances here existing, with a barge this old, something more in the way of care and caution in the handling of the libellant's property would seem reasonably to have been required on the part of the vessel owner. Surely they must have had or should have had information as to what was a safe load for the barge to carry and general instructions, at least, should have been given to the barge captain. As has been pointed out, the main purpose of the limited liability statute is to protect the vessel owner from the faults and contracts of the agents when not under the principal's control. It cannot fairly be said that the loading of this barge under all the circumstances was so far removed from the vessel owner's control and supervision as to warrant the latter's complete divorce from any responsibility with regard to the amount of its load. The failure to exercise any supervision under the circumstances constituted more than mere casual neglect in a particular instance, and would appear from the respondent's testimony to have been in accordance with a general settled policy to

leave the loading even in the home port entirely to the judgment of the barge captain, uninstructed by the owners. In my opinion something more is required of vessel owners under such circumstances to entitle them to avail themselves of the limited liability statute. See Kellogg & Sons v. Hicks, 285 U. S. 502, 511, 52 S. Ct. 450, 76 L. Ed. 903; Md. Transp. Co. v. Dempsey, 279 F. 94 (C. C. A. 4); In re Eastern Transp. Co. (D. C., Md.) 37 F.(2d) 355; The Edward (In re Jacobson), 52 F.(2d) 179, 1931 A. M. C. 1541 (D. C.).

I gathered at the hearing that counsel will have no difficulty in agreeing upon the extent of the libellant's loss. If agreement cannot be reached, testimony may be submitted to determine the amount or, if the parties prefer, reference to a master may be had to establish it. When established by agreement or finding, counsel may submit the appropriate decree. I assume the findings of fact and conclusions of law herein stated will be considered sufficiently specific to comply with the general admiralty rule in that respect. If more is desired, specific findings of fact and conclusions of law consistent herewith can be submitted for consideration.